**BURSOR & FISHER, P.A.**
Neal J. Deckant (State Bar No. 322946)
Julia K. Venditti (State Bar No. 332688)
1990 North California Boulevard, 9th Floor
Walnut Creek, CA  94596
Telephone:  (925) 300-4455
Facsimile:  (925) 407-2700
Email: ndeckant@bursor.com
          jvenditti@bursor.com

*Attorneys for Plaintiff and the Putative Class*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LARI WITT, individually and on behalf of all others similarly situated,<br><br>    Plaintiff,<br><br>      v.<br><br>LIVE NATION ENTERTAINMENT, INC.,<br><br>    Defendant. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>(1) Violation of Title III of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. §§ 12101, *et seq.*<br>(2) Violation of California's Unruh Civil Rights Act ("Unruh Act"), Cal. Civ. Code §§ 51, *et seq.*<br>(3) Violation of the California Disabled Persons Act ("CDPA"), Cal. Civ. Code §§ 54, *et seq.*<br><br>**<u>DEMAND FOR JURY TRIAL</u>** |

Plaintiff Lari Witt ("Plaintiff") brings this action on behalf of herself and all others similarly situated against Defendant Live Nation Entertainment, Inc. ("Defendant" or "Live Nation"). Plaintiff makes the following allegations pursuant to the investigation of her counsel and upon information and belief, except as to allegations specifically pertaining to herself and her counsel, which are based on personal knowledge.

## INTRODUCTION

1. This putative class action lawsuit seeks to put an end to systemic civil rights violations committed by Defendant at Shoreline Amphitheatre against disabled individuals within California, as set forth under Title III of the Americans with Disability Act of 1990 ("ADA"), 42 U.S.C. §§ 12101, *et seq*., and corresponding California statutes.

2. The ADA was enacted over twenty-five years ago, establishing the most important and comprehensive civil rights law for persons with disabilities in our country's history. One of the principal goals of the ADA is the integration of people with disabilities into the country's economic and social life. *See* 42 U.S.C. 12101(a). Despite this long-standing mandate, Defendant—the operator and lessor of the business, property, buildings, parking lots, and/or portions thereof located at or about One Amphitheatre Parkway, Mountain View, CA 94043, commonly known as the "Shoreline Amphitheatre"—has failed to provide disabled persons with full and equal access to its goods and services in violation of the ADA by constructing, altering, and/or failing to remove architectural barriers that prevent persons with mobility limitations from using and enjoying their facilities in the full and equal manner as able-bodied persons are able to do. In so doing, Defendant has also violated various California civil rights laws, including the Unruh Civil Rights Act ("Unruh Act"), Cal. Civ. Code §§ 51, *et seq*.; and the California Disabled Persons Act ("CDPA"), Cal. Civ. Code § 54, *et seq*.[1]

3. Shoreline Amphitheatre is an outdoor amphitheater located in Mountain View, California. The venue has a capacity of 22,500, with 6,500 reserved seats and 16,000 general

---

[1] The ADA generally prohibits "public accommodations" from discriminating against people with disabilities. *See* 42 U.S.C. § 12182(a). Likewise, California has enacted several statutes which also bar discrimination against people with disabilities, including the Unruh Act and the CDPA, both of which state that a violation of the ADA is a violation of each of those respective acts. *See* Cal. Civ. Code § 51(f); Cal. Civ. Code § 54.1(d).

1  admission spaces on the lawn.  There are five parking lots on the facility site surrounding the

2  amphitheater: Lots A, B, C, D, and E (described below).  The Shoreline Amphitheatre site—which

3  includes the Amphitheatre building, the adjacent parking lot facilities, and any path of travel

4  connecting such parking facilities and the Amphitheatre building (collectively, "Shoreline

5  Amphitheatre," the "Shoreline Site," or the "Property")—is a place of public accommodations

6  subject to Title III of the ADA, the Unruh Act, and the CDPA.  42 U.S.C. § 12181(7)(C)-(D), (I).

7  4.  As explained in detail below, Plaintiff is a natural person who has a substantially

8  limiting physical impairment.  As a result of her physical impairment, Plaintiff is unable to

9  independently stand or walk and requires the use of a wheelchair for mobility.  Plaintiff is

10  therefore an individual with qualifying disabilities within the meaning of state and federal civil

11  rights laws.  *See* 42 U.S.C. § 12102(1)-(2); 28 C.F.R. § 35.104; 28 C.F.R. § 35.108; 28 C.F.R. §

12  36.104; Cal. Gov't Code § 12926(m); *id*. § 12926.1(c).

13  5.  As a disabled American, Plaintiff has the right to meaningfully access, enjoy, and

14  participate in society just as non-disabled persons do.  No person or entity subject to Title III of the

15  ADA may discriminate against an individual on the basis of disability in the full and equal

16  enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of a place

17  of public accommodation.  *See* 42 U.S.C. § 12182(a); 28 C.F.R. § 36.201(a).  "For purposes of

18  subsection (a), discrimination includes … (iv) a failure to remove architectural barriers, and

19  communication barriers that are structural in nature, in existing facilities … where such removal is

20  readily achievable[.]"  42 U.S.C. § 12182(b)(2)(A)(iv); *see also* 28 C.F.R. § 36.304(a) ("A public

21  accommodation shall remove architectural barriers in existing facilities, including communication

22  barriers that are structural in nature, where such removal is readily achievable, *i.e.*, easily

23  accomplishable and able to be carried out without much difficulty or expense.").

24  6.  In addition, "where an entity can demonstrate that the removal of a barrier under

25  clause (iv) is not readily achievable," discrimination includes "a failure to make such goods,

26  services, facilities, privileges, advantages, or accommodations available through alternative

27  methods if such methods are readily achievable."  42 U.S.C. § 12182(b)(2)(A)(v).

28  7.  Similarly, where, as here, a public accommodations or commercial facility has been

"altered … in a manner that affects or could affect the usability of the facility or part thereof," "discrimination for purposes of section 12182(a) of th[e ADA also] includes … a failure to make alterations in such a manner that, to the maximum extent feasible, the altered portions of the facility are readily accessible to and usable by individuals with disabilities, including individuals who use wheelchairs."  42 U.S.C. § 12183(a)(2).

8.     As is explained in greater detail below, Plaintiff visited Defendant's Shoreline Site in California during the relevant period and was directed by Defendant's employees to park in the "ADA" parking spaces in Lot A of the Shoreline Site.[2]  However, in doing so, Plaintiff encountered numerous architectural barriers in Lot A, the removal of which was "readily achievable."  By failing to remove these barriers, Defendant has directly violated 42 U.S.C. § 12182(b)(2)(A)(iv), among other provisions of the ADA (enumerated below).

9.     By acting as herein alleged, Defendant has created a dangerous situation for wheelchair users and other mobility impaired persons, and it has failed, and continues to fail, to operate its facilities in a manner such that they are readily accessible to and usable by individuals with disabilities.

10.     As a result of Defendant's discriminatory acts and omissions, Plaintiff has suffered, and will continue to suffer, damages, and has been, and will continue to be prevented and deterred from accessing and using Defendant's goods, services, and facilities to the same extent as, and in a manner equal to, her able-bodied peers.  Through this lawsuit, Plaintiff seeks injunctive relief to require Defendant to make the Shoreline Site, including Lot A, accessible to disabled persons and to ensure that any disabled person who attempts to use these facilities will be provided accessible facilities.  Plaintiff also seeks recovery of damages for her physical, mental, and emotional injuries, and her discriminatory experiences and denial of access and of civil rights, the denial of which is continuing as a result of Defendant's failure to provide disability accessible facilities.

[2] *See* Live Nation, Venues: Shoreline Amphitheatre, *Know Before You Go*, *available at* https://www.livenation.com/venue/KovZpZA6ta1A/shoreline-amphitheatre-events#know-before-you-go (last accessed Apr. 29, 2024) ("[P]lease be advised that parking is limited. Overflow ADA parking is available in Lot A off of Shoreline Blvd. Transportation will be available to assist those with ADA needs to the main entrance. The Accessibility Shuttle pick-up and drop-off zone is located in the northwest corner of Lot A, near the Shoreline Blvd & Bill Graham Pkwy/North Road intersection.") (emphasis added).

Plaintiff also seeks recovery of reasonable statutory attorneys' fees, litigation expenses, and costs, under federal and state law.

11. Accordingly, Plaintiff brings this action individually and on behalf of all others similarly situated nationwide and seeks declaratory, injunctive, and equitable relief, and attorneys' fees and costs to redress Defendants' unlawful discrimination on the basis of disability in violation of Title III of the ADA, 42 U.S.C. §§ 12101 *et seq*., and its implementing regulations.

12. Additionally, Plaintiff brings this action individually and on behalf of all other similarly situated California residents and seeks declaratory, injunctive, and equitable relief and attorneys' fees and costs to redress Defendant's architectural barriers and unlawful discrimination on the basis of disability at Shoreline Amphitheatre, in violation of California's Unruh Civil Rights Act ("Unruh Act"), Cal. Civ. Code §§ 51, *et seq*., and California's Disabled Persons Act ("CDPA"), Cal. Civ. Code §§ 54, *et seq*., and for statutory damages in accordance with California Civil Code §§ 52(a) and 54.3.

13. The ADA and the Unruh Act expressly contemplate injunctive relief aimed at modification of a policy or practice that Plaintiffs seek in this action. *See* ADA, 42 U.S.C. § 12188(a)(2) ("Where appropriate, injunctive relief shall also include requiring the provision of … service, modification of a policy, or provision of alternative methods."); *see also* Unruh Act, Cal. Civ. Code § 52(c)(3). Consistent with 42 U.S.C. § 12188(a)(2) and the Unruh Act, Plaintiff seeks a permanent injunction requiring that, *inter alia*: (1) Defendant take all steps necessary to bring the Shoreline Site into full compliance with the requirements set forth in the ADA and its implementing regulations, as detailed below; and (2) Plaintiff's representatives monitor Defendant's facilities to ensure the injunctive relief ordered pursuant has been implemented and will remain in place.

14. Plaintiff's claims for permanent injunctive relief are asserted as a nationwide class claim pursuant to Fed. R. Civ. P. 23(b)(2).[3] In addition, Plaintiff's claims for statutory damages

---

[3] Rule 23(b)(2) was specifically intended to be utilized in civil rights cases where plaintiffs seek injunctive relief for their own benefit and that of a class of similarly situated individuals. To that end, the note to the 1996 amendment to Rule 23 states: "Subdivision (b)(2) … is intended to reach

pursuant to Cal. Civ. Code §§ 52(a) and 54.3 are asserted as a California-only class claim pursuant to Fed. R. Civ. P. 23(b)(3).   For the foregoing reasons, Plaintiff brings this action individually and on behalf of all others similarly situated based on Defendant's unlawful conduct, seeking damages, restitution, declaratory relief, injunctive relief, and reasonable attorneys' fees and costs, for violation of: (1) Title III of the ADA, 42 U.S.C. §§ 12101, *et seq.*; (2) California's Unruh Act, Cal. Civ. Code §§ 51, *et seq.*; (3) the CDPA, Cal. Civ. Code §§ 54, *et seq.*; and (4) Cal. Health and Safety Code §§ 19955, *et seq.*

## THE PARTIES

15.    Plaintiff Lari Witt ("Plaintiff") is, and, at all times relevant herein, has been, a California resident and citizen, who is qualified individual with a physical "disability" as defined under the ADA (*see* 42 U.S.C. § 12102(1)-(2); 28 C.F.R. § 36.104), and California Government Code § 12926.  Specifically, Plaintiff, having survived an arteriovenous malformation ("AVM") in her medulla oblongata, has residual semi-paralysis on her left side and cannot walk very far.  As a result, she uses various mobility devices to manage her mobility limitations, including a wheelchair, walker, and cane.  Plaintiff's physical impairment therefore substantially limits several "major life activities," 42 U.S.C. § 12102(2)(A), including, *inter alia*, Plaintiff's ability to perform manual tasks, walk, stand, lift, and bend.  *See id.*  Accordingly, Plaintiff is, and at all times relevant herein was, a "qualified person with a disability," a "physically disabled person," an "individual with a disability," as those and similar terms are defined under the ADA and its implementing regulations (42 U.S.C. § 12131(2); 42 U.S.C. § 12102(1)-(2); 28 C.F.R. 35.104; 28 C.F.R. 36.104), and California law (Cal. Gov't Code § 12926(m); *id*. § 12926.1(c)).  Plaintiff's impairment is thus a disability protected by Titles II and III of the ADA, the Unruh Act, and the CDPA.  As explained further below, Plaintiff visited Defendant's Shoreline Site—and personally encountered numerous architectural barriers and violations of state and federal law thereon—on September 27, 2022.

---

situations where a party has taken action or refused to take action with respect to a class, and final relief of an injunctive nature or a corresponding declaratory nature, settling the legality of the behavior with respect to  the class as a whole, is appropriate . …  Illustrative are various actions in the civil rights field where a party is charged with discriminating unlawfully against a class, usually one whose members are incapable of specific enumeration."

16.   Defendant Live Nation Entertainment, Inc. ("Defendant" or "Live Nation") is a private entity[4] and American multinational entertainment company that, *inter alia*, promotes, operates, and manages ticket sales for live entertainment internationally.  In fact, Live Nation holds itself out as the "largest live entertainment company in the world;" "the largest producer of live music concerts in the world, based on total fans that attend Live Nation events as compared to events of other promoters;" "one of the world's leading artist management companies based on the number of artists represented;" and "the world's leading live entertainment ticketing sales and marketing company, based on the number of tickets [it] sell[s]."[5]

17.   Additionally, relevant to Plaintiff's claims, Live Nation also owns and/or leases and operates entertainment venues.  In fact, as of early 2024, Live Nation's annual shareholders report stated the company has controlling interests in 373 venues globally, including 197 entertainment venues throughout North America, which Live Nation believes makes it "the second largest operator of music venues in the world."[6]  As indicated above, one of these 373 venues is Shoreline Amphitheatre, which Live Nation operates pursuant to a long-term lease agreement with the City

---

[4] *See* 42 U.S.C. § 12181(6) ("The term 'private entity' means any entity other than a public entity (as defined in section 12131(1) of this title).").

[5] Live Nation Annual Report 2024, at 2, *available at* https://investors.livenationentertainment.com/sec-filings/annual-reports/content/0001335258-24-000017/0001335258-24-000017.pdf; *see also id*. ("We believe our global footprint is one of the world's largest music advertising networks for corporate brands and includes one of the world's leading ecommerce websites based on a comparison of gross sales of top internet retailers."); *id*. at 4 ("We believe that our global network of promoters, venues and festivals provides us with a strong position in the live concert industry.  We believe we have one of the largest global networks of live entertainment businesses in the world, with offices in 45 countries worldwide. … We also believe that we are one of the largest music festival producers in the world with 146 festivals globally in 2023.  In addition, we believe that our global ticketing distribution network—with approximately 10,000 clients worldwide in 2023 —makes us the largest ticketing network in the world."); *see also* Live Nation, *Latest Financial Results*, https://investors.livenationentertainment.com/ ("Live Nation Entertainment (NYSE: LYV) is the world's leading live entertainment company comprised of global market leaders: Ticketmaster, Live Nation Concerts, and Live Nation Media & Sponsorship.") (emphasis added); *see also* https://www.livenationentertainment.com/ ("As the world's leading live entertainment company, … Live Nation produces more concerts, sells more tickets, and connects more brands to music than anyone else in the world.  Once you take a look at our global live entertainment platform, you'll understand why we're the market leader across all three of our core industries.") (emphasis added).

[6] Live Nation Annual Report 2024, *supra*, at 4 ("[W]e own, lease, operate, have exclusive booking rights for, or have an equity interest for which we have a significant influence in 373 venues and have operations located across 49 countries as of the end of 2023, **making us, we believe, the second largest operator of music venues in the world**.") (emphasis added).

of Mountain View. Indeed, at all relevant times herein, Live Nation has leased and operated the Shoreline Amphitheatre, including the commercial business, property, buildings, parking lots, and walkways located at One Amphitheatre Pkwy, Mountain View, California 94043, and all portions thereof ("Shoreline Amphitheatre," the "Shoreline Site," or the "Property"), pursuant to a long-term lease agreement with the Site's owner, the City of Mountain View. Relevant here, the Shoreline Site, which includes the Amphitheatre building adjacent parking facilities and any path of travel connecting such parking facilities and the Amphitheatre building, is a "public accommodation" and "business establishment" subject to the requirements of Title III of the ADA, the Unruh Act, and the CDPA.[7] Live Nation is responsible for the development and maintenance of, and planning and implementing infrastructure improvements to, the Shoreline Site.

18. On information and belief, the Shoreline Site has undergone alterations, structural repairs, or additions at several times throughout the years—including specifically the parking facilities adjacent to the Amphitheatre building—with the most recent physical alterations starting after March 14, 2012. Thus, the Shoreline Site, including the purportedly ADA-compliant accessible parking of Lot A, is subject to and must comply with the 2010 ADA Standards for Accessible Design,[8] which consist of the requirements set forth in the Architectural Barriers Act Accessibility Guidelines, issued by the Access Board on July 23, 2004, and codified at Appendices B and D to 36 C.F.R. part 1191 (the "2004 ADAAG"), and the Title III regulations for new construction and alterations at 28 C.F.R. part 36, subpart D ("Subpart D") (together with the 2004 ADAAG, the "2010 Standards").[9]

---

[7] *See* 42 U.S.C. § 12181(7)(C)-(D), (I) ("The following private entities are considered public accommodations for purposes of this subchapter, if the operations of such entities affect commerce … (C) a motion picture house, theater, concert hall, stadium, or other place of exhibition entertainment; (D) an auditorium … or other place of public gathering; (I) … or other place of recreation[.]"); *see also* 42 U.S.C. § 12182(a) ("No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation.") (emphasis added).

[8] *See* 28 C.F.R. § 36.406(a)(3) ("New construction and alterations subject to §§ 36.401 or 36.402 shall comply with the 2010 Standards … if the start of physical construction or alterations occurs on or after March 15, 2012.").

[9] The Department of Justice adopted the 2010 ADA Standards for Accessible Design (2010

19.    Further, the Shoreline Site must also comply with the 2010 Standards for the separate reason that, as explained below, with respect to elements of the Site that are at issue here, the Shoreline Site *never* complied with several provisions of the previous iteration of the ADA Standards for Accessible Design, originally published on July 26, 1991, and republished as Appendix D to Part 36 (the "1991 Standards").[10, 11]  Additionally, irrespective of the alteration history, such premises are subject to the ADA's "readily achievable" barrier removal requirements under, *inter alia*, 42 U.S.C. § 12182(b)(2)(A)(iv) and/or 42 U.S.C. § 12182(b)(2)(A)(v);[12] the ADA's "readily accessible" requirements under 42 U.S.C. § 12183(a)(2);[13] and parallel

_____

Standards) as the regulatory standards for the new construction and alteration of facilities subject to its regulations under the Americans with Disabilities Act (ADA), effective March 15, 2012.  For public accommodations and commercial facilities, the 2010 Standards consist of the regulations at 28 C.F.R. part 36, subpart D and the versions of Appendices B and D to this part published in the 2009 edition of the Code of Federal Regulations.  *See* 28 C.F.R. § 36.104 ("For purposes of this part, the term … *2010 Standards* means the 2010 ADA Standards for Accessible Design, which consist of the 2004 ADAAG and the requirements contained in subpart D of this part.").

[10] *See* 28 C.F.R. § 36.104 ("For purposes of this part, the term … *1991 Standards* means requirements set forth in the ADA Standards for Accessible Design, originally published on July 26, 1991, and republished as Appendix D to this part.").

[11] *See also* 28 C.F.R. § 36.304(d)(2)(ii)(B) ("On or after March 15, 2012, elements in existing facilities that do not comply with the corresponding technical and scoping specifications for those elements in the 1991 Standards must be modified to the extent readily achievable to comply with the requirements set forth in the 2010 Standards.  Noncomplying newly constructed and altered elements may also be subject to the requirements of § 36.406(a)(5)."); 28 C.F.R. § 36.406(a)(5)(ii) ("Newly constructed or altered facilities or elements covered by §§ 36.401 or 36.402 that were constructed or altered before March 15, 2012 and that do not comply with the 1991 Standards shall, on or after March 15, 2012, be made accessible in accordance with the 2010 Standards.").

[12] *See* 42 U.S.C. § 12182(b)(2)(A)(iv) ("For purposes of subsection (a), discrimination includes … (iv) a failure to remove architectural barriers … where such removal is readily achievable[.]") (emphasis added); 42 U.S.C. § 12182(b)(2)(A)(v) ("For purposes of subsection (a), discrimination includes … (v) where an entity can demonstrate that the removal of a barrier under clause (iv) is not readily achievable, a failure to make such goods, services, facilities, privileges, advantages, or accommodations available through alternative methods if such methods are readily achievable.") (emphasis added).

[13] *See* 42 U.S.C. § 12183(a)(2) ("[A]s applied to public accommodations and commercial facilities, discrimination for purposes of section 12182(a) of this title includes … (2) with respect to a facility or part thereof that is altered by, on behalf of, or for the use of an establishment in a manner that affects or could affect the usability of the facility or part thereof, a failure to make alterations in such a manner that, to the maximum extent feasible, the altered portions of the facility are readily accessible to and usable by individuals with disabilities, including individuals who use wheelchairs.  Where the entity is undertaking an alteration that affects or could affect usability of or access to an area of the facility containing a primary function, the entity shall also make the alterations in such a manner that, to the maximum extent feasible, the path of travel to the altered area and the bathrooms, telephones, and drinking fountains serving the altered area, are readily

1   implementing regulations.[14]

2       20.     Plaintiff reserves the right to amend this Complaint to add different or additional

3   defendants, including without limitation any officer, director, employee, supplier, or distributor of

4   Defendant who has knowingly and willfully aided, abetted, and/or conspired in the discriminatory

5   and unlawful alleged herein.

6                           **JURISDICTION AND VENUE**

7       21.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §

8   1331 because this case arises directly under the "laws[] … of the United States"—namely, Title III

9   of the Americans with Disabilities Act, 42 U.S.C. §§ 12101 *et seq*., and its implementing

10  regulations—and thus raises a federal question.  For the same reason, this Court also has subject

11  matter jurisdiction under 28 U.S.C. § 1343(a)(4).[15]  In addition, this Court has supplemental

12  jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367.

13      22.     This Court also has subject matter jurisdiction over this action pursuant to 28

14  U.S.C. § 1332(d)(2)(A), as amended by the Class Action Fairness Act of 2005 ("CAFA"), because

---

accessible to and usable by individuals with disabilities where such alterations to the path of travel … are not disproportionate to the overall alterations in terms of cost and scope (as determined under criteria established by the Attorney General).") (emphasis added).

[14] *See, e.g.*, 28 C.F.R. § 36.304(a) ("A public accommodation shall remove architectural barriers in existing facilities, including communication barriers that are structural in nature, where such removal is readily achievable, i.e., easily accomplishable and able to be carried out without much difficulty or expense.") (emphasis added); 28 C.F.R. § 36.304(d)(3) ("If … the measures required to remove a barrier would not be readily achievable, a public accommodation may take other readily achievable measures to remove the barrier that do not fully comply with the specified requirements.") (emphasis added); 28 C.F.R. § 36.211(a) ("A public accommodation shall maintain in operable working condition those features of facilities and equipment that are required to be readily accessible to and usable by persons with disabilities by the Act or this part.") (emphasis added); 28 C.F.R. § 36.402(a)(1) ("Any alteration to a place of public accommodation or a commercial facility, after January 26, 1992, shall be made so as to ensure that, to the maximum extent feasible, the altered portions of the facility are readily accessible to and usable by individuals with disabilities, including individuals who use wheelchairs.") (emphasis added); 28 C.F.R. § 36.403(a)(1) ("An alteration that affects or could affect the usability of or access to an area of a facility that contains a primary function shall be made so as to ensure that, to the maximum extent feasible, the path of travel to the altered area and the restrooms, telephones, and drinking fountains serving the altered area, are readily accessible to and usable by individuals with disabilities, including individuals who use wheelchairs, unless the cost and scope of such alterations is disproportionate to the cost of the overall alteration.") (emphasis added).

[15] 28 U.S.C. § 1343(a)(4) ("The district courts shall have original jurisdiction of any civil action authorized by law to be commenced by any person: … (4) To recover damages or to secure equitable or other relief under any Act of Congress providing for the protection of civil rights[.]")

this is a class action where the aggregate claims for all members of the proposed class are in excess of $5,000,000.00, exclusive of interests and costs, there are over 100 members of the putative class, and there is at least minimal diversity in that most members of the proposed classes are citizens of a state different from most Defendants.

23.     This Court has personal jurisdiction over the parties because Defendant has, at all times relevant hereto, systematically and continually conducted, and continue to conduct, business in California.  Indeed, Defendant maintains the Shoreline Site in this State.  Defendant therefore has sufficient minimum contacts with this State and/or has intentionally availed itself of the benefits and privileges of the California consumer market through the promotion, marketing, and sale of its products and/or services to residents within this District and throughout California, such that it should reasonably expect to be brought into court in this State and District as a result of its activities here.  Further, Plaintiff resides in California, is a citizen of California, purchased her tickets for a concert at Shoreline Amphitheatre from California, visited Defendant's facility in California, suffered injury in California, and submits to the jurisdiction of this Court.

24.     Pursuant to 28 U.S.C. § 1391, this Court is the proper venue for this action because a substantial part of the events, omissions, and acts giving rise to the claims herein occurred in this District.  Also, Defendant maintains its place of public accommodation and commercial facility at issue—the Shoreline Amphitheatre—in this District, and Plaintiff resides in this District.  Moreover, Defendant systematically conducts business in this District and throughout the State of California.

## FACTUAL BACKGROUND

**A.     Overview Of Federal And State Laws Prohibiting Discrimination On The Basis Of Disability**

### i.     Title III of the ADA

25.     In 1990, the United States Congress made findings that laws were needed to more fully protect "some 43 million Americans [with] one or more physical or mental disabilities;" that "historically society has tended to isolate and segregate individuals with disabilities;" that "such forms of discrimination against individuals with disabilities continue to be a serious and pervasive

social problem;" that "the Nation's proper goals regarding individuals with disabilities are to assure equality of opportunity, full participation, independent living and economic self sufficiency for such individuals;" and that "the continuing existence of unfair and unnecessary discrimination and prejudice denies people with disabilities the opportunity to compete on an equal basis and to pursue those opportunities for which our free society is justifiably famous." 42 U.S.C. § 12101.

26.     Title III of the ADA prohibits discrimination against the disabled in the full and equal enjoyment of public accommodations:

> No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation.

42 U.S.C. § 12182(a) (General Rule).

27.     To aid in the construction of this rule under Section 12182(a), the ADA sets forth several general prohibitions, including, relevant to Plaintiff's claims, the following prohibition on denials of participation:

> It shall be discriminatory to subject an individual or class of individuals on the basis of a disability or disabilities of such individual or class, directly, or through contractual, licensing, or other arrangements, to a denial of the opportunity of the individual or class to participate in or benefit from the goods, services, facilities, privileges, advantages, or accommodations of an entity.

42 U.S.C. § 12182(b)(1)(A)(i).[16]

28.     This general prohibition is supplemented by various, more specific requirements.[17]

*See* 42 U.S.C. § 12182(b)(2)(A) ("For purposes of subsection (a), discrimination includes ….").

---

[16] *Accord* 28 C.F.R. § 36.202(a) ("***Denial of participation.*** A public accommodation shall not subject an individual or class of individuals on the basis of a disability or disabilities of such individual or class, directly, or through contractual, licensing, or other arrangements, to a denial of the opportunity of the individual or class to participate in or benefit from the goods, services, facilities, privileges, advantages, or accommodations of a place of public accommodation.").

[17] The specific requirements and prohibitions of "subsection (b)(2)(A) [of Section 12182], by its clear terms, provides a non-exhaustive, illustrative list of certain actions that qualify as discrimination." *Karczewski v. DCH Mission Valley LLC*, 862 F.3d 1006, 1011-12 (9th Cir. 2017) (emphasis added, citation omitted); *see also Spector v. Norwegian Cruise Line Ltd.*, 545 U.S. 119, 128-29 (2005) (noting that the general non-discrimination rule in subsection (a) is "supplemented by various, more specific requirements," such as those found in subsection (b)(2)(A)).

Particularly relevant here, a place of public accommodations commits discrimination within the meaning of Section 12182(a) when it: (1) "fail[s] to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities," 42 U.S.C. § 12182(b)(2)(A)(ii)[18]; and (2) "fail[s] to remove architectural barriers … in existing facilities … where such removal is readily achievable," 42 U.S.C. § 12182(b)(2)(A)(iv).[19]

29.     In addition, "where an entity can demonstrate that the removal of a barrier under clause (iv) is not readily achievable," discrimination includes "a failure to make such goods, services, facilities, privileges, advantages, or accommodations available through alternative methods if such methods are readily achievable."  42 U.S.C. § 12182(b)(2)(A)(v).[20]

30.     Similarly, where a public accommodations or commercial facility has been "altered … in a manner that affects or could affect the usability of the facility or part thereof," "discrimination for purposes of section 12182(a) of th[e ADA also] includes … a failure to make alterations in such a manner that, to the maximum extent feasible, the altered portions of the facility are readily accessible to and usable by individuals with disabilities, including individuals who use wheelchairs."  42 U.S.C. § 12183(a)(2).[21]

---

[18] *Accord* 28 C.F.R. § 36.302(a) ("A public accommodation shall make reasonable modifications in policies, practices, or procedures, when the modifications are necessary to afford goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, unless the public accommodation can demonstrate that making the modifications would fundamentally alter the nature of the goods, services, facilities, privileges, advantages, or accommodations.").

[19] *Accord* 28 C.F.R. § 36.304(a) ("A public accommodation shall remove architectural barriers in existing facilities … where such removal is readily achievable, *i.e.*, easily accomplishable and able to be carried out without much difficulty or expense.").

[20] *Accord* 28 C.F.R. § 36.304(d)(3) ("If … the measures required to remove a barrier would not be readily achievable, a public accommodation may take other readily achievable measures to remove the barrier that do not fully comply with the specified requirements.").  *See also* 28 C.F.R. § 36.305(a) ("Where a public accommodation can demonstrate that barrier removal is not readily achievable, the public accommodation shall not fail to make its goods, services, facilities, privileges, advantages, or accommodations available through alternative methods, if those methods are readily achievable."); *see also, e.g., id*. § 36.305(b)(1) ("Examples of alternatives to barrier removal include, but are not limited to, the following actions … (3) Relocating activities to accessible locations[.]").

[21] *See also* 28 C.F.R. § 36.403(a)(1) ("An alteration that affects or could affect the usability of or access to an area of a facility that contains a primary function shall be made so as to ensure that, to the maximum extent feasible, the path of travel to the altered area and the restrooms, telephones,

31.     The ADA's implementing regulations further provide that "[a] public accommodation shall maintain in operable working condition those features of facilities and equipment that are required to be readily accessible to and usable by persons with disabilities by the Act or this part."  28 C.F.R. § 36.211(a).

32.     The ADA's prohibitions and requirements cited above, *see supra*, and at the footnotes appended thereto, give rise to a place of public accommodation's ongoing obligation to ensure accessibility by, as necessary, assessing and modifying its policies, practices, and procedures; identifying and removing any architectural barriers; and maintaining, upgrading, and/or altering its equipment and facilities.  These duties apply to public accommodations at all times, without regard to whether and when the place of public accommodation implemented such policies, practices, and procedures, or whether and when it constructed and/or last altered its physical facilities.

33.     As set forth below, Defendant's conduct with respect to the Shoreline Site, including Lot A, fails to comply with each of these provisions, in violation of the general prohibition of discrimination under 42 U.S.C. § 12182(a).

34.     The ADA also establishes additional duties regarding architectural barriers, the application of which depends largely on the date of the last alteration.  For instance, 28 C.F.R. § 36.402(a)(1) provides that "[a]ny alteration to a place of public accommodation or a commercial facility, <u>after January 26, 1992</u>, shall be made so as to ensure that, to the maximum extent feasible, the altered portions of the facility are readily accessible to and usable by individuals with disabilities, including individuals who use wheelchairs."  (Emphasis added).

35.     Moreover, the physical facilities of a place of public accommodation must comply with the applicable version of the ADA Standards for Accessible Design—either the 1991 Standards or the 2010 Standards, depending on the date of the last alteration.  In particular, the ADA's implementing regulations specify that "alterations shall comply:" "with the <u>1991 Standards</u> … if the start of physical construction or alterations occurs before September 15, 2010," 28 C.F.R.

---

and drinking fountains serving the altered area, are readily accessible to and usable by individuals with disabilities, including individuals who use wheelchairs, unless the cost and scope of such alterations is disproportionate to the cost of the overall alteration.").

§ 36.406(a)(1) (emphasis added); "<u>either</u> with the 1991 Standards or with the 2010 Standards … if the start of physical construction or alterations occurs on or after September 15, 2010 and before March 15, 2012," *id.* § 36.406(a)(2) (emphasis added); and—relevant here—"**with the 2010 <u>Standards</u> … if the start of physical construction or alterations occurs on or after March 15, 2012**," *id.* § 36.406(a)(3) (emphasis added).  That said, notwithstanding 28 C.F.R. § 36.406(a)(1)-(2), "altered facilities or elements … that were … altered before March 15, 2012 and that do not comply with the 1991 Standards shall, on or after March 15, 2012, be made accessible in accordance with the 2010 Standards."  *Id.* § 36.406(a)(5)(ii); *accord* 28 C.F.R. § 36.304(d)(2)(ii)(B) ("On or after March 15, 2012, elements in existing facilities that do not comply with the corresponding technical and scoping specifications for those elements in the 1991 Standards must be modified to the extent readily achievable to comply with the requirements set forth in the 2010 Standards. ….").

36.     As noted above, the Shoreline Site, including Lot A, is subject to and must comply with the 2010 Standards because Defendant has made physical alterations to, or affecting the usability of, Lot A, which began on after March 15, 2012.  *See* 28 C.F.R. § 36.406(a)(3).  Significantly, as explained in detail below, the Shoreline Site fails to comply with several provisions of the 2010 Standards, including Sections 206, 208, 302, 403, and 502 thereto.  Furthermore, the Shoreline Site is subject to the 2010 Standards for the separate reason that, even prior to March 15, 2012, the parking facilities of the Shoreline Site *never* complied with numerous corresponding technical and scoping specifications of the 1991 Standards, including Sections 4.1, 4.3, 4.5, and 4.6.  *See* 28 C.F.R. § 36.406(a)(5)(ii); *see also id.* § 36.304(d)(2)(ii)(B).

### i.     <u>California Law Protecting Disability Access</u>

37.     "In California, '[t]wo overlapping laws, the Unruh Civil Rights Act (§ 51) and the Disabled Persons Act (§§ 54-55.3), are the principal sources of state disability access protection.'" *Thurston v. Omni Hotels Mgmt. Corp.*, 69 Cal. App. 5th 299, 305 (2021), *review denied* (Dec. 22, 2021) (quoting *Jankey v. Lee*, 55 Cal. 4th 1038, 1044 (2012)).

### California's Unruh Civil Rights Act

38.     Section 51(b) of the California Civil Code, known as the "Unruh Civil Rights Act"

1    (the "Unruh Act"), provides protection from discrimination by all business establishments in

2    California, including public accommodations, and prohibits discrimination on the basis of, *inter*

3    *alia*, disability.  Specifically, Section 51(b) provides that:

4           All persons within the jurisdiction of this state are free and equal, and
            no matter what their … disability [or] medical condition … are
5           entitled to the full and equal accommodations, advantages, facilities,
            privileges, or services in all business establishments of every kind
6           whatsoever.

7    Cal. Civ. Code § 51(b).

8           39.    Pursuant to Section 51(f) of the Unruh Act, "[a] violation of the right of any

9    individual under the federal Americans with Disabilities Act of 1990 (Public Law 101-336) shall []

10   constitute a violation of this section."  Cal. Civ. Code § 51(f).  "[A]n Unruh [ ] Act claimant …

11   need not prove intentional discrimination upon establishing an ADA violation[.]"  *Thurston v.*

12   *Omni Hotels Mgmt. Corp.*, 69 Cal. App. 5th 299, 309 (2021), *review denied* (Dec. 22, 2021).[22]

13          40.    Private citizens may enforce the Unruh Act, as the California Legislature has

14   provided a private right of action.  *See* Cal. Civ. Code § 52(c) ("Whenever there is reasonable

15   cause to believe that any person or group of persons is engaged in conduct of resistance to the full

16   enjoyment of any of the rights described in this section, and that conduct is of that nature and is

17   intended to deny the full exercise of those rights, … any person aggrieved by the conduct may

18   bring a civil action in the appropriate court by filing with it a complaint."); *id*. § 52(e) ("Actions

19   brought pursuant to this section are independent of any other actions, remedies, or procedures that

20   may be available to an aggrieved party pursuant to any other law.").

---

[22] *Munson v. Del Taco, Inc.*, 46 Cal. 4th 661, 678 & n.13 (2009) ("The 2008 Legislature was informed—and may be presumed to have been aware—that damages under the Unruh [ ] Act might be awarded for denial of ADA mandated access without proof of intentional discrimination. … Yet, … the reform approach the Legislature ultimately chose did not include requiring such … proof of intent to discriminate. … Even if we agreed with defendant that adding an intent requirement to the Unruh [ ] Act would be warranted to curb abuse, we would not be free to substitute our own judgment for that of the Legislature.") (emphasis added, internal footnote omitted); *see also* Senate Committee on the Judiciary, *Analysis of Senate Bill No. 1608 (2007–2008 Reg. Sess.) as amended April 21, 2008*, page 7 (noting that in the context of an ADA violation, federal case law "provides that a plaintiff is not required to show intentional discrimination in order to recover under Unruh"); Assembly Committee on the Judiciary, *Analysis of Senate Bill No. 1608 (2007–2008 Reg. Sess.) as amended May 27, 2008*, page 4 (same).

41.     Where an aggrieved person brings a civil action in court pursuant to the Unruh Act, the "complaint shall contain … [a] request for preventive relief, including an application for a permanent or temporary injunction, restraining order, or other order against the person or persons responsible for the conduct, as the complainant deems necessary to ensure the full enjoyment of the rights described in this section."  Cal. Civ. Code § 52(c)(3).

42.     Further, Section 52(a) authorizes aggrieved persons to obtain statutory damages "for each and every" Unruh Act violation, as follows:

> Whoever denies, aids or incites a denial, or makes any discrimination or distinction contrary to Section 51[] … is liable for each and every offense for the actual damages, and any amount that may be determined by a jury, or a court sitting without a jury, up to a maximum of three times the amount of actual damage but in no case less than four thousand dollars ($4,000), and any attorney's fees that may be determined by the court in addition thereto, suffered by any person denied the rights provided in Section 51[.]

Cal. Civ. Code § 52(a) (emphasis added).

43.     As explained below, Defendant violates Section 51(f) of the Unruh Act through its violations of the ADA under 42 U.S.C. §§ 12182(a), 12182(b)(1)(A)(i), 12182(b)(2)(A)(ii), 12182(b)(2)(A)(iv), 12182(b)(2)(A)(v), and/or 12183(a)(2), and of the ADA's implementing regulations under 28 C.F.R. §§ 36.201(a), 36.202(a), 36.211(a), 36.302(a), 36.304(a), 36.304(d)(1), 36.304(d)(2)(ii)(B), 36.305(a), 36.402(a)(1), 36.403(a)(1), and 36.406(a), as detailed below.

**The California Disabled Persons Act**

44.     Pursuant to the California Disabled Persons Act ("CDPA"), Cal. Civ. Code §§ 54, *et seq.*, "[i]ndividuals with disabilities or medical conditions have the same right as the general public to the full and free use of … public buildings, … public facilities, and other public places." Cal. Civ. Code § 54(a).  Defendant is subject to Section 54(a) because Plaintiff has "disabilities" and/or "medical conditions" within the meaning of the CDPA, and Defendant's Amphitheatre is a commercial facility open to the general public.

45.     The CDPA further provides that "[i]ndividuals with disabilities shall be entitled to full and equal access, as other members of the general public, to accommodations, advantages,

facilities, … and privileges of all … <u>places of public accommodation, amusement</u>, or resort, and other places to which the general public is invited[.]"  Cal. Civ. Code § 54.1(a)(1) (emphasis added).  For purposes of this section, the CDPA defines "'[f]ull and equal access'… [to] mean[] access that meets the standards of Title[] … III of the Americans with Disabilities Act of 1990 (Public Law 101-336) and federal regulations adopted pursuant thereto, except that, if the laws of this state prescribe higher standards, it shall mean access that meets those higher standards."  Cal. Civ. Code § 54.1(a)(3).

46.     Additionally, like the Unruh Act, the CDPA wholly incorporates ADA violations. *See* Cal. Civ. Code § 54(c) ("A violation of the right of an individual under the Americans with Disabilities Act of 1990 (Public Law 101-336) also constitutes a violation of this section."); *see also* Cal. Civ. Code § 54.1(d) ("A violation of the right of an individual under the Americans with Disabilities Act of 1990 (Public Law 101-336) also constitutes a violation of this section, and this section does not limit the access of any person in violation of that act.").

47.     Private citizens may enforce the CDPA, as the California Legislture has provided a private right of action.  *See* Cal. Civ. Code § 54.3(b).

48.     Section 54.3(a) of the CDPA authorizes aggrieved persons to obtain statutory damages in an amount not less than $1,000 for each CDPA violation.  Specifically, that section states, in relevant part, that "[a]ny person or persons, firm or corporation who denies or interferes with admittance to or enjoyment of the public facilities as specified in Sections 54 and 54.1 … or otherwise interferes with the rights of an individual with a disability under Sections 54[ and] 54.1 … is liable for each offense for the actual damages … up to a maximum of three times the amount of actual damages but <u>in no case less than one thousand dollars ($1,000)</u>, and attorney's fees as may be determined by the court in addition thereto, suffered by any person denied any of the rights provided in Sections 54[ and] 54.1…."  Cal. Civ. Code § 54.3(a) (emphasis added).

49.     "A showing of intent is not required to obtain damages under the [CDPA]." *Delgado v. Orchard Supply Hardware Corp.*, 826 F. Supp. 2d 1208, 1219 (E.D. Cal. 2011) (citing *Donald v. Cafe Royale, Inc.*, 218 Cal. App. 3d 168, 177-80 (1990)).

50.     Further, pursuant to Section 55 of the CDPA, "[a]ny person who is aggrieved or potentially aggrieved by a violation of Section 54 or 54.1 of this code[] … may bring an action to enjoin the violation.  The prevailing party in the action shall be entitled to recover reasonable attorney's fees."  Cal. Civ. Code § 55; *see also* Cal. Civ. Code § 54.3(b) ("The remedies in this section are nonexclusive and are in addition to any other remedy provided by law, including, but not limited to, any action for injunctive or other equitable relief available to the aggrieved party or brought in the name of the people of this state or of the United States.").

51.     As explained below, Defendant violated Sections 54(a) and 54.1(a)(1) of the CDPA because its conduct and/or failures to act have resulted in the denial of Plaintiff's full and free use of Defendant's Shoreline Site, including Lot A.  *See* Cal. Civ. Code §§ 54(a), 54.1(a)(1); *see also Turner v. Ass'n of Am. Med. Colleges*, 167 Cal. App. 4th 1401, 1412 (2008), *as modified on denial of reh'g* (Nov. 25, 2008) ("Civil Code section 54, subdivision (a) entitles disabled persons to 'full and free use' of 'public places.'") (emphasis added); *id.* ("[The CDPA's] focus is upon *physical* access to public places ….") (italics in original; internal citations omitted) (quoting *Urhausen v. Longs Drug Stores California, Inc.*,155 Cal. App. 4th 254, 261 (2007)).

52.     Defendant also violated Sections 54(c) and 54.1(d) of the CDPA vis-à-vis its numerous ADA violations, as detailed below.  *See* Cal. Civ. Code §§ 54(c), 54.1(d).

**B.     Plaintiff And Members Of The Putative Classes Have Been Denied Full And Equal Access To Defendant's Facilities**

53.     At all times mentioned herein, Plaintiff was and is a qualified disabled person due residual semi-paralysis on her left side resulting from an AVM in her medulla oblongata. Plaintiff's disabilities render her largely nonambulatory and require her to use various devices for mobility, including a wheelchair, walker, and cane.

54.     On September 27, 2022, Plaintiff visited Shoreline Amphitheatre with her husband to attend a concert headlined by The Doobie Brothers.[23]  Plaintiff visited the Property as a bone fide patron with the intent to avail herself of the goods and services offered to the public within but

---

[23] *See* https://www.mountainviewamphitheater.com/events/the-doobie-brothers/; https://www.concertarchives.org/concerts/doobie-brothers--3312102.

found that the Property was littered with architectural barriers in violation of the ADA.

55.     Shoreline Amphitheatre is an outdoor amphitheater located in Mountain View, California.  It is a facility open to the public, a place of public accommodation, and a commercial business establishment.  The venue has a capacity of 22,500, with 6,500 reserved seats and 16,000 general admission on the lawn.  As noted *supra*, the Shoreline Site, which includes the amphitheater building itself and all surrounding parking lots, is leased and operated by Live Nation.  Specifically, there are at least five parking lots adjacent to the amphitheater building on the Shoreline Site: Lots A, B, C, D, and E.  At issue here is Lot A.



56.     Lots A and B of the Shoreline Site are generally designated for general admission parking, meaning these lots are open to, and must be shared by, all patrons.[24]  "General Parking is included in the ticket price for most events at Shoreline Amphitheatre," but Lots A and B are located at a significant distance from the entrance to the Amphitheatre building.[25]

---

[24] *See* Live Nation, *Shoreline Amphitheatre: Know Before You Go*, https://www.livenation.com/venue/KovZpZA6ta1A/shoreline-amphitheatre-events#know-before-you-go.

[25] *Id.*

57.     Lots C and D, on the other hand, are closest to the Amphitheatre building, but they are reserved for Premier Parking and private VIP Parking, respectively.[26]  For easier entry to and exit from the Shoreline Site, patrons may purchase access to Lots C and D for an additional fee.[27]  Additionally, there are some accessible parking spaces in Lots C and D, but, as Defendant well knows, those spaces fill up quickly and have consistently proven to be insufficient to accommodate the number of disabled patrons in need of parking for a given event at Shoreline.  Live Nation has warned patrons that space for ADA-compliant parking in those lots is limited and access to these lots for disabled individuals is subject to availability, and it therefore recommends that disabled patrons arrive to the Amphitheatre early in order to ensure the availability of accessible parking nearby the Amphitheatre before Lots C and D fill up.[28, 29]



---

[26] *See id*. ("Premier Parking is located in C Parking Lot (Bill Graham Parkway and Amphitheatre Parkway intersection). … The VIP lots are located D Lot.").

[27] *See id*. ("Premier Parking is available for every event with the price varying.  This can be purchased prior to the show … or on site at the venue. … Guests must have a pass or be on the parking list to access the[ VIP] lots.").

58.     Once Lots C and D have reached full capacity, "Overflow ADA parking is available in Lot A off of Shoreline Blvd."[30]  Lot A is inferior to Lots C and D in multiple regards.  First, unlike Lots C and D, Lot A is <u>not</u> immediately adjacent to the Amphitheatre building.  Instead, Lot A is located about a third of a mile away from the Amphitheatre's entrance.  On foot, the route from Lot A to the Amphitheatre's entrance entails an approximately eight-minute walk that would require pedestrians to traverse N. Shoreline Boulevard and Bill Graham Parkway and bear an approximate 39-foot incline before arriving to the Amphitheatre building:



59.     To mitigate this issue, Live Nation provides a shuttle service that takes disabled patrons from the northwest corner of Lot A to the Amphitheatre's main entrance.[31]  However, this

---

[28] *See id.* ("Accessible Parking is located in C & D parking lots. … You do not need to have an accessible placard in order to park in this lot, <u>but please be advised that parking is limited</u>.") (emphasis added); *id.* ("ADA parking in the C and D lots can be used without Premier Parking purchase, <u>subject to availability</u>.  <u>We recommend folks arrive early to ensure accessible parking availability</u>.") (emphasis added).  *See also id.* ("Parking lots will generally open 1 hour prior to our scheduled gate time. Gate times vary, but are usually 90 minutes prior to show time.").

[29] In addition, "oversized vehicle parking is located in Lot C and will be charged double the Premier Parking rate if they will be remaining on site during the event."  *Id.* ("Buses are considered an oversized vehicle ….").

[30] *Id.*

[31] *See id.* ("Transportation will be available to assist those with ADA needs [from Lot A] to the main entrance.  The Accessibility Shuttle pick-up and drop-off zone is located in the northwest corner of Lot A, near the Shoreline Blvd & Bill Graham Pkwy/North Road intersection.").

presents other problems.  In particular, disabled individuals cannot reach the Accessibility Shuttle

pick-up point in the northwest corner of Lot A from their parking space inside of Lot A without

traversing unstable ground surfaces devoid of any defined access aisle.  Indeed, while the ground

surfaces of Lots C and D are finely paved and have markings to define the width of each parking

space (including the accessibility spaces and their adjacent access aisles), the ground surface of Lot

A consists of loose gravel and lacks any markings whatsoever, whether for parking spaces

(including accessible spaces), access aisles, or otherwise:

### Lot C

 

### Lot A



60.     Lot E is even farther away from the Amphitheatre building than Lots A and B.  Lot

E is designated for general admission parking.  There is a pedestrian pathway leading from Lot E

to the Amphitheatre building, but no shuttle.

61.     As explained above, it is extremely common that disabled patrons visiting Shoreline Amphitheatre for a scheduled event are relegated to parking in Lot A given that, as noted, the ordinary accessible parking spaces in Lots C and D fill up quickly and are rarely sufficient in number to accommodate the volume of disabled persons in need of parking at Shoreline Amphitheatre for a given event.  Defendant is aware of this issue, and thus recommends that patrons requiring accessible parking arrive to Shoreline Amphitheatre early in order to ensure access to disability parking spaces in their parking facilities.[32]  However, even patrons that arrive early are not guaranteed accessible parking due to limited availability.  Thus, despite Defendant's use of the term "*overflow* ADA parking"[33] with respect to Lot A, functionally, more disabled patrons typically park in Lot A than in Lots C and D for any given event at Shoreline Amphitheatre.

62.     That is consistent with Plaintiff's experience.  Plaintiff arrived reasonably early to Shoreline Amphitheatre on September 27, 2022, *i.e.*, reasonably in advance of the time the doors were scheduled to open for the Doobie Brothers concert.  Yet, upon arrival, Plaintiff and her husband were informed by Defendant's employee that Lots C and D were already at capacity in terms of accessible parking, and they were therefore directed to park in Lot A.  Once parked in Lot A (as directed), Plaintiff used a wheelchair to navigate through the parking lot, and she also brought with her a cane for the purpose of navigating the amphitheater building once inside.

63.     Unfortunately for Plaintiff, she quickly realized that Defendant failed to provide wheelchair accessible handicap parking in conformity with the applicable ADA Standards as it relates to mobility-impaired patrons like Plaintiff.  Indeed, Lot A lacked various features that are typical of accessible parking facilities, necessary in order to ensure that the parking facility is readily accessible to and usable by individuals with disabilities (including individuals with mobility limitations), and required by federal and state laws prohibiting discrimination on the basis of disability.  The violations that Plaintiff encountered during her visit to the Shoreline Site, include but are not limited to, Defendant's failure: to provide the purportedly accessible parking of

---

[32] *See* Live Nation, *Shoreline Amphitheatre: Know Before You Go*, *supra*.

[33] *Id*.

Lot A in a location constituting the shortest accessible route of travel to the amphitheater building's accessible entrance; to provide an accessible route connecting the parking spaces of Lot A with other accessible buildings, facilities, elements, and spaces on the Shoreline Site; to provide stable, firm, and slip resistant ground surfaces; to provide accessible parking spaces and access aisles that are sufficiently wide or otherwise consisting of the required dimensions; to denote the width of the purportedly accessible parking spaces and access aisles with striping or markings; and to provide the required minimum number of accessible parking spaces.  These violations are enumerated and described in greater detail below.

64.     Plaintiff believes that there are other features of the Shoreline Site, such as the path of travel between the purportedly accessible handicap parking spaces in Lot A and the accessible entrance to the amphitheater building, that likely fail to comply with the applicable ADA Standards, and she seeks to have fully compliant paths of travel available for mobility-impaired patrons.

**C.     The Architectural Barriers Of The Shoreline Site, Including Lot A, Violate The ADA, Unruh Act, And CDPA**

65.     As noted above, the Shoreline Site is subject to the ADA's statutory prohibitions, including, *inter alia*, the "readily achievable" barrier removal requirements under 42 U.S.C. § 12182(b)(2)(A)(iv) and "readily accessible" requirements under 42 U.S.C. § 12183(a)(2), as well as related implementing regulations.

66.     Additionally, the Shoreline Site, including the Lot A, must comply with the 2010 ADA Standards for Accessible Design (the "2010 Standards"), given that, on information and belief, the Site—including, specifically, the parking facilities adjacent to the amphitheater building—underwent new construction and/or alterations, structural repairs, or additions at several times throughout the years, with the most recent physical alterations beginning after March 14, 2012.  *See* 28 C.F.R. § 36.406(a)(3) ("[A]lterations … shall comply with the 2010 Standards … if the start of physical … alterations occurs on or after March 15, 2012.").  Further, as noted above, the Shoreline Site must also comply with the 2010 Standards for the separate reason that, as of March 15, 2012, and at all times since then, to and through the present, the elements of the

Shoreline Site that are at issue here have not complied with the corresponding technical and scoping specifications for those elements in the 1991 Standards.[34]  Thus, the ADA mandates that these non-complying elements "must be modified to the extent readily achievable to comply with the requirements set forth in the 2010 Standards."  28 C.F.R. § 36.304(d)(2)(ii)(B); *see also* 28 C.F.R. § 36.406(a)(5)(ii).[35]

67.     Here, Defendant violates several ADA statutory provisions, implementing regulations, and Standards for Accessible Design, enumerated and described in detail below.

68.     First, the architectural barriers and violations of ADA Standards that Plaintiff personally encountered during her visit to the Shoreline Site on September 27, 2022, include, but are not limited to, the following:

a.     Plaintiff had difficulty exiting the vehicle and struggled to maneuver her wheelchair from her parking space and throughout the Shoreline Site, including between the purportedly accessible parking spaces of Lot A and the shuttle pick-off location in the northwest corner of Lot A, as Lot A is covered in loose gravel with gravel particles that move freely as patrons move across the surface.  Thus, every inch of Lot A presents an uneven walking path that

---

[34] Different standards apply to altered facilities depending on the date of alteration.  Generally, if the last alteration to the Shoreline Site occurred on or after January 26, 1993, but before September 15, 2010, then the alteration must comply with the 1991 Standards.  *See* 28 C.F.R. § 36.406(a)(1). If the last alteration occurred after September 15, 2010, but before March 15, 2012, then the alteration may comply with *either* the 1991 Standards *or* the 2010 Standards.  *See id.* § 36.406(a)(2).  However, if—as Plaintiff is informed and believes is true in this case—the start of the last alteration occurred on or after March 15, 2012, the 2010 Standards apply to the altered portion.  *See id.* § 36.406(a)(3).  Furthermore, facilities that were altered "before March 15, 2012 and that do not comply with the 1991 Standards shall, on or after March 15, 2012, be made accessible in accordance with the 2010 Standards."  *See id.* § 36.406(a)(5)(ii).

Regardless, "any alteration" made to the Property after January 26, 1992, must have been made so as to ensure that, to the maximum extent feasible, the altered portions of the Property are readily accessible to and usable by individuals with disabilities, including individuals, like Plaintiff, who use wheelchairs.  28 C.F.R. § 36.402(a)(1) ("Any alteration to a place of public accommodation or a commercial facility, after January 26, 1992, shall be made so as to ensure that, to the maximum extent feasible, the altered portions of the facility are readily accessible to and usable by individuals with disabilities, including individuals who use wheelchairs.").  An alteration is deemed undertaken after January 26, 1992, if the physical alteration of the property begins after that date.  28 C.F.R. § 36.402(a)(2).

[35] Ultimately, discovery in this matter will reveal whether and when such alterations have taken place at the Property, and which corresponding technical and scoping specification Defendant must meet or exceed to bring the Property into compliance with the ADA.

is <u>not</u> stable, firm, and/or slip-resistant, in violation of **Sections 4.5.1, 4.1.2(4), and 4.3.6 of the 1991 Standards**[36] and **Sections 302.1, 403.2, and 502.4 of the 2010 Standards**.[37]  The remediation of this barrier is both technically feasible and readily achievable.  Removal of this barrier can be accomplished by simply re-paving the surface of Lot A using common stable, firm, and slip-resistant materials.  This measure is readily achievable.

        b.      Moreover, Defendant has failed to provide an accessible route between Lot A and the "Accessibility Shuttle pick-up and drop-off zone" in the northwest corner of Lot A.  Rather, mobility-impaired patrons directed to park in the "Overflow ADA parking" lot, like Plaintiff, are required to traverse the unstable loose gravel covering Lot A in order to reach the shuttle pick-up zone in the northwest corner of the lot from their parking space therein.  As a result, Plaintiff had to proceed with extreme caution when traversing the exterior route from Lot A to the facility entrance, as the unstable ground surface consisting of loose gravel presented her with a tipping hazard that could damage the bottom of her wheelchair.  Thus, Plaintiff had difficulty traversing the path of travel, as it was not continuous and accessible, in violation of **Sections 4.1.2(1), 4.1.2(2), 4.3.1, 4.3.2(1), 4.3.2(2), and 4.3.2(3) of the 1991 Standards**[38] and **Sections**

---

[36] 1991 Standards § 4.5.1 ("Ground and floor surfaces along accessible routes and in accessible rooms and spaces … shall be <u>stable, firm, slip-resistant</u>, and shall comply with 4.5.") (emphasis added); *id*. § 4.5.1 Advisory ("People who have difficulty walking or maintaining balance or who use crutches, canes, or walkers, and those with restricted gaits are particularly sensitive to slipping and tripping hazards.  For such people, a stable and regular surface is necessary for safe walking[.] … <u>Wheelchairs can be propelled most easily on surfaces that are hard, stable, and regular.</u>  <u>Soft loose surfaces such as … loose sand or gravel … can significantly impede wheelchair movement</u>.  Slip resistance is based on the frictional force necessary to keep a shoe heel or crutch tip from slipping on a walking surface under conditions likely to be found on the surface. ….") (emphasis added); *id*. § 4.1.2(4) ("Ground surfaces along accessible routes and in accessible spaces shall comply with 4.5."); *id*. § 4.3.6 ("The surface of an accessible route shall comply with 4.5.").

[37] 2010 Standards § 302.1 ("Floor and ground surfaces shall be <u>stable, firm, and slip resistant</u> and shall comply with 302.") (emphasis added); *id*. § 302.1 Advisory ("A stable surface is one that remains unchanged by contaminants or applied force, so that when the contaminant or force is removed, the surface returns to its original condition.  <u>A firm surface resists deformation by either indentations or particles moving on its surface</u>.  A slip-resistant surface provides sufficient frictional counterforce to the forces exerted in walking to permit safe ambulation.") (emphasis added); *id*. § 403.2 ("Floor or ground surfaces shall comply with 302."); *id*. § 502.4 ("Floor or Ground Surfaces. Parking spaces and access aisles serving them shall comply with 302.").

[38] 1991 Standards § 4.1.2(1) ("At least one accessible route complying with 4.3 shall be provided within the boundary of the site <u>from … accessible parking spaces[ and] passenger loading zones if provided … to an accessible building entrance</u>.") (emphasis added); *id*. § 4.1.2(2) ("At least one

**206.2.1 and 206.2.2 of the 2010 Standards**.[39] As above, removal of this barrier is readily achievable.

                c.       The purportedly accessible parking spaces of Lot A are not striped or marked to denote their width.  In fact, there are <u>no</u> stripes or markings on the ground of lot A whatsoever, whether for parking spaces, access aisles, or otherwise, in violation of the ADA's implementing regulation under **Section 4.6.3 of the 1991 Standards** and **Sections 502.1, 502.2, 502.3, 502.3.3, and 502.7 of the 2010 Standards**.[40]  Removal of this barrier can be accomplished through the addition of striping or markings to the surface of Lot A, to denote the dimensions of accessible parking spaces and their adjacent access aisles.  This measure is readily achievable.[41]

---

accessible route complying with 4.3 shall connect accessible buildings, accessible facilities, accessible elements, and accessible spaces that are on the same site."); *id*. § 4.3.1 ("All walks, … , aisles, … and other spaces that are part of an accessible route shall comply with 4.3."); *id*. § 4.3.2(1) ("At least one accessible route within the boundary of the site shall be provided <u>from public transportation stops, accessible parking, and accessible passenger loading zones … to the accessible building entrance they serve</u>.") (emphasis added); *id*. § 4.3.2(2) ("At least one accessible route shall connect accessible buildings, facilities, elements, and spaces that are on the same site."); *id*. § 4.3.2(3) ("At least one accessible route shall connect accessible building or facility entrances with all accessible spaces and elements … within the building or facility.").

[39] 2010 Standards § 206.2.1 ("At least one accessible route shall be provided within the site from accessible parking spaces and accessible passenger loading zones; public streets and sidewalks; and public transportation stops to the accessible building or facility entrance they serve."); *id*. § 206.2.2 ("At least one accessible route shall connect accessible buildings, accessible facilities, accessible elements, and accessible spaces that are on the same site.").

[40] 2010 Standards § 502.1 ("[W]idth measurements of parking spaces and access aisles shall be made from the centerline of the markings."); *id*. § 502.2 ("Car parking spaces … <u>shall be marked to define the width</u>, <u>and shall have an adjacent access aisle</u> complying with 502.3.") (emphasis added); *id*. § 502.3 ("Access aisles serving parking spaces shall comply with 502.3.  Access aisles shall adjoin an accessible route. ….."); *see also id*. § 502.3 Advisory ("Accessible routes must connect parking spaces to accessible entrances. …."); *id*. § 502.3.3 ("**Marking.** <u>Access aisles shall be marked</u> so as to discourage parking in them.") (emphasis added); *see also id*. § 502.3.3 Advisory ("Because these requirements permit the van access aisle to be as wide as a parking space, it is important that the aisle be clearly marked."); *id*. § 502.7 ("<u>Parking spaces and access aisles shall be designed so that cars and vans, when parked, cannot obstruct the required clear width of adjacent accessible routes</u>.") (emphasis added).

[41] *See* ADA.gov, *ADA Compliance Brief: Restriping Parking Spaces* (originally issued Dec. 1, 2015; last updated Feb. 28, 2020), *available at* https://www.ada.gov/resources/restriping-parking-spaces/ ("When a business … restripes parking spaces in a parking lot or parking structure (parking facilities), it must provide accessible parking spaces as required by the 2010 ADA Standards for Accessible Design (2010 Standards). … In addition, businesses or privately owned facilities that provide goods or services to the public have a continuing ADA obligation to remove barriers to access in existing parking facilities when it is readily achievable to do so.  <u>Because restriping is relatively inexpensive, it is readily achievable in most cases</u>.") (emphasis added); *see also* https://archive.ada.gov/restriping_parking/restriping2015.pdf (same).

d.      Further, without markings, there can be no set width or length for parking spaces or designated access aisle.  Thus, the purportedly accessible parking spaces and access aisles of Lot A are not sufficiently wide or long, and/or lack the dimensions required, in further violation of **Sections 4.1.2(5)(a) and 4.6.3 of the 1991 Standards**[42] and **Sections 502.2, 502.3, 502.3.1, and 502.3.2 of the 2010 Standards**.[43]  As above, removal of this barrier is readily achievable.

e.      For same reason, the ADAAG requirement setting forth a minimum number of accessible parking spaces is necessarily not met, as the amount of handicap parking spaces cannot be quantified in the absence of markings denoting the existence and parameters of such a space.  Thus, the required number of accessible parking spaces is not provided in Lot A, in violation of **Sections 4.1.2(5)(a) and 4.6.1 of the 1991 Standards**[44] and **Section 208.2 of the**

---

[42] 1991 Standards § 4.1.2(5)(a) ("…[A]ccess aisles adjacent to accessible spaces shall be 60 in (1525 mm) wide minimum."); *id*. § 4.6.3 ("Parking Spaces.  Accessible parking spaces shall be at least 96 in (2440 mm) wide.  Parking access aisles shall be part of an accessible route to the building or facility entrance and shall comply with 4.3. …."); *see also id*. ("Dimensions of Parking Spaces. The access aisle shall be a minimum of 60 inches (1525 mm) wide for cars except a minimum of 96 inches (2440 mm) wide for van-accessible parking spaces.  The width of the parking space shall be a minimum of 96 inches (2440 mm).  The accessible route connected to the access aisle shall be a minimum of 36 inches (915 mm) wide.").

[43] 2010 Standards § 502.2 ("Car parking spaces shall be 96 inches (2440 mm) wide minimum[.]"); *id*. § 502.3.1 ("Width. Access aisles serving car and van parking spaces shall be 60 inches (1525 mm) wide minimum."); *id*. § 502.3.2 ("Length. Access aisles shall extend the full length of the parking spaces they serve.").

[44] 1991 Standards § 4.1.2(5)(a) ("An accessible site shall meet the following minimum requirements: … If parking spaces are provided for self-parking by … visitors, … then accessible spaces complying with 4.6 shall be provided in each such parking area in conformance with the table below. …."); *id*. § 4.6.1 ("Minimum Number. Parking spaces required to be accessible by 4.1 shall comply with 4.6.2 through 4.6.5.").

1   **2010 Standards**.[45]  Removal of this barrier is readily achievable.[46]

2           f.         Defendant fails to designate the purportedly accessible parking spaces of

3   Lot A with adequate signage, in violation of **Sections 4.1.2(7)(a), 4.6.4, and 4.30.7 of the 1991**

4   **Standards**[47] and **Sections 216.5, 502.6, and 703.2.1 of the 2010 Standards**.[48]  Removal of this

5   barrier is readily achievable through the addition of ADA-compliant signage.

6           g.         The accessible parking spaces in Lot A are <u>not</u> located on the shortest

7   accessible route of travel from Lot A (or the other adjacent parking lots on the Shoreline Site) to

---

[45] 2010 Standards § 208.2 ("Parking spaces complying with 502 shall be provided in accordance with Table 208.2 except as required by 208.2.1, 208.2.2, and 208.2.3. Where more than one parking facility is provided on a site, the number of accessible spaces provided on the site shall be calculated according to the number of spaces required <u>for each parking facility</u>.") (emphasis added); *see also id*. at Table 208.2 (specifying minimum number of required accessible parking spaces based on total number of parking spaces provided in parking facility); *id*. § 208.2 Advisory ("The term 'parking facility' is used Section 208.2 instead of the term 'parking lot' so that it is clear that both parking lots and parking structures are required to comply with this section. <u>The number of parking spaces required to be accessible is to be calculated separately for each parking facility; the required number is not to be based on the total number of parking spaces provided in all of the parking facilities provided on the site</u>.") (emphasis added).

[46] *See, e.g.*, 28 C.F.R. § 36.304(b)(18) ("Examples of steps to remove barriers include, but are not limited to, the following actions … (18) <u>Creating designated accessible parking spaces</u>[.]") (emphasis added); 28 C.F.R. § 36.304(c)(1) ("A public accommodation is urged to take measures to comply with the barrier removal requirements of this section in accordance with the following order of priorities. (1) <u>First</u>, a public accommodation should take measures to provide access to a place of public accommodation from public sidewalks, <u>parking</u>, or public transportation.  <u>These measures include, for example, … providing accessible parking spaces</u>. ….") (emphasis added).

[47] 1991 Standards § 4.1.2(7)(a) ("An accessible site shall meet the following minimum requirements: … (7) Building Signage. Signs which designate permanent rooms and spaces shall comply with 4.30.1, 4.30.4, 4.30.5 and 4.30.6. Other signs which provide direction to, or information about, functional spaces of the building shall comply with 4.30.1, 4.30.2, 4.30.3, and 4.30.5. <u>Elements and spaces of accessible facilities which shall be identified by the International Symbol of Accessibility and which shall comply with 4.30.7 are</u>: (a) <u>Parking spaces designated as reserved for individuals with disabilities</u>[.]") (emphasis added); 4.6.4 ("<u>Accessible parking spaces shall be designated as reserved by a sign showing the symbol of accessibility</u> (see 4.30.7). … Such signs shall be located so they cannot be obscured by a vehicle parked in the space.") (emphasis added); *see also id*. § 4.6.4 Advisory ("Signs designating parking places for disabled people can be seen from a driver's seat if the signs are mounted high enough above the ground and located at the front of a parking space."); *id*. § 4.30.7(1) ("Facilities and elements required to be identified as accessible by 4.1 shall use the international symbol of accessibility.  The symbol shall be displayed as shown in Fig. 43(a) and (b).").

[48] 2010 Standards § 216.5 ("Parking. Parking spaces complying with 502 shall be identified by signs complying with 502.6."); *id*. § 502.6 ("Identification. Parking space identification signs shall include the International Symbol of Accessibility complying with 703.7.2.1. Signs identifying van parking spaces shall contain the designation 'van accessible.' Signs shall be 60 inches (1525 mm) minimum above the finish floor or ground surface measured to the bottom of the sign."); *id*. § 703.7.2.1 ("International Symbol of Accessibility. The International Symbol of Accessibility shall comply with Figure 703.7.2.1.").

---

the amphitheater building's accessible entrance, in violation of **Section 4.6.2 of the 1991 Standards**[49] and **Section 208.3.1 of the 2010 Standards**.[50]  Removal of this barrier is readily achievable through the addition of striping to denote the location of accessible parking spaces to the portion of Lot A that is closest to the amphitheater building entrance.  In addition, to the extent that no parking space in Lot A could be considered to be "located on the shortest accessible route of travel … to the [amphitheater building's] accessible entrance" as the ADA requires (since Lot A is so much farther from the entrance than other, more proximate spaces, such as Lots C and D), alternative measures exist that are technically feasible, readily achievable, and capable of remedying the negative discriminatory affect Defendant's non-compliance with the ADA's "shortest accessible route of travel" requirement has had, and will continue to have, on mobility impaired patrons directed to park in Lot A—namely, relocation of those parking spaces.[51]

69.     Each of the foregoing violations is simultaneously a violation of the 1991 Standards *and* the 2010 Standards, as promulgated by the U.S. Department of Justice.

70.     The discriminatory violations described above, *see supra*, may not be an exhaustive list of the ADA violations that exist at the Property, but they are the result of a preliminary inspection of the Property conducted by Plaintiff and her representatives, and include all those

---

[49] 1991 Standards § 4.6.2 ("Location. Accessible parking spaces serving a particular building shall be located on the shortest accessible route of travel from adjacent parking to an accessible entrance. In parking facilities that do not serve a particular building, accessible parking shall be located on the shortest accessible route of travel to an accessible pedestrian entrance of the parking facility.  In buildings with multiple accessible entrances with adjacent parking, accessible parking spaces shall be dispersed and located closest to the accessible entrances.").

[50] 2010 Standards § 208.3.1 ("Parking spaces complying with 502 that serve a particular building or facility shall be located on the shortest accessible route from parking to an entrance complying with 206.4. …").

[51] *See* 28 C.F.R. § 36.305(b)(3) ("**Examples of alternatives to barrier removal include, but are not limited to, the following actions … (3) <u>Relocating activities to accessible locations</u>**[.]") (emphasis added); *see also id*. § 36.305(a) ("General.  Where a public accommodation can demonstrate that barrier removal is not readily achievable, the public accommodation shall not fail to make its goods, services, facilities, privileges, advantages, or accommodations available through alternative methods, if those methods are readily achievable."); *accord* 2 U.S.C. § 12182(b)(2)(A)(v) ("For purposes of subsection (a), discrimination includes … (v) where an entity can demonstrate that the removal of a barrier under clause (iv) is not readily achievable, a failure to make such goods, services, facilities, privileges, advantages, or accommodations available through alternative methods if such methods are readily achievable.").

personally experienced by Plaintiff.  That inspection further revealed that the remediation of all

violations/barriers listed above are both technically feasible and readily achievable.

71.     Plaintiff is not alone in her experience.  In online reviews, other Shoreline

Amphitheatre patrons have a long history of similarly complaining about many of these features.[52]

72.     Furthermore, based on the same features and conduct as described above,

Defendant has also violated, and continues to violate, the ADA as follows:

a.     Defendant's failure to comply with 2010 Standards, if applicable, constitutes

a violation of **28 C.F.R. § 36.406(a)(3)**, or **28 C.F.R. § 36.406(a)(5)(ii)** and **28 C.F.R. §**

**36.304(d)(2)(ii)(B)**.  Alternatively, if the 1991 Standards are applicable, then Defendant's failure

to comply with the 1991 Standards constitutes a violation of **28 C.F.R. § 36.406(a)(1)**.  Finally, if

---

[52] *See, e.g.*, Reddit post dated Sep. 22, 2021,
https://www.reddit.com/r/SanJose/comments/ptjq9h/shoreline_amphitheater_parking/ ("Terrible
traffic ingress and egress for a concert venue. **Parking in the dirt lot feels like a 5 mile walk to
the entry gate**. ….") (emphasis added); Trip Advisor, Review by user @SamiB94510 (posted May
31, 2023), https://www.tripadvisor.com/Attraction_Review-g32761-d3213057-Reviews-
Shoreline_Amphitheatre-Mountain_View_California.html#REVIEWS ("It took over an hour to go
ONE MILE from the freeway to the parking lot. … They really **need to do some major
upgrading** as well.") (emphasis added); *id.*, Review by user @A5815MEchristyp (posted Jul. 5,
2022) ("We spent 1 hour trying to park before the show, and 2 hours trying to leave the **dirt
parking lot**[.] … It was an absolute nightmare ….") (emphasis added); *id.*, Review by user
@KellyC1231 (posted Jun. 21, 2022) ("Be warned. We prepaid for premium parking. **When we
got to the premium parking area, the lot was full**.") (emphasis added); *id.*, Review by user
@CandyHarrington (posted Jun. 27, 2019) ("[T]here were a few problems on my first visit at the
Doobie Brothers-Santana Concert. I had read prior reviews so I knew to get there early to park. I
also received a call on the day of the concert saying that it was sold out and that parking would be
first-come, and that it opened at 4, so get there early. We got there about 4:15[.] … **Once we
parked there was absolutely no signage or information**[.] … After the concert, the big fail was
in the parking, basically because of the **lack of … signage**….") (emphasis added); *id.*, Review by
user @Ginalsc (posted Oct. 18, 2018) ("**Parking ... [is i]n the dirt**[.]") (emphasis added); *id.*,
Review by user @FVStrona (posted Oct. 2, 2016) ("Recently Inhad a chance to see the Dolly
Parton show here at the Shoreline. I was somewhat surprised at how difficult it was to find
information on parking; especially the vip parking. … **[T]he parking lots are pretty poorly
marked** ….") (emphasis added); *id.*, Review by user @Robert C (posted Jul. 8, 2013) ("We went
to the San Francisco Symphony Fourth of July concert on July 4, 2013 at the Shoreline
Amphitheater. Our tickets were $29.50 plus $10.50 for service fees. Live Nation Entertainment
(formerly Ticketmaster) has exclusive rights to sell tickets to all events at this venue, and imposes
similar service fees on each ticket. … We were directed to pull in behind another row of cars [in
the parking lot] by other traffic controllers. **Asphalt parking lot, with lots of sand and dirt blown
onto the surface**. … We walk through two parking lots, and wait with hundreds of others, to cross
Shoreline boulevard, as directed by the traffic controllers. We go up a pedestrian bridge, with the
clean asphalt VIP parking lot, below, right next to the Amphitheater. … <u>The big advantage of the
VIP lots is that they are closest to the theater</u>, and only have to make a right turn to get out. Our
[general admission] parking lot is on the other side of Shoreline, and requires us to make a left turn
to exit. ….") (emphasis added).

---

Defendant had discretion as to whether to comply with the 1991 or 2010 Standards based on an alteration occurring between September 15, 2010, and March 15, 2012, then Defendant's failure to comply with both standards as described above constitutes a violation of **28 C.F.R. § 36.406(a)(2)**. In turn, Defendant's failure to comply with **28 C.F.R. § 36.406**—whether under subdivisions (a)(1), (a)(2), (a)(3), or (a)(5)(ii)—constitutes a further violation of **28 C.F.R. § 36.304(d)(1)** ("[M]easures taken to comply with the barrier removal requirements of this section shall comply with the applicable requirements for alterations in § 36.402 and §§ 36.404 through 36.406 of this part for the element being altered.").

        b.     Defendant has "subject[ed] an individual or class of individuals [Plaintiff and putative Class Members] on the basis of a disability …, directly, or through contractual, licensing, or other arrangements, to a denial of the opportunity of the individual or class to participate in or benefit from the goods, services, facilities, privileges, advantages, or accommodations of an entity," in violation of **42 U.S.C. § 12182(b)(1)(A)(i)** and **28 C.F.R. § 36.202(a)**.

        c.     Defendant has "fail[ed] to make reasonable modifications in policies, practices, or procedures" with respect to, *inter alia*, the disability parking throughout the Shoreline Site, despite the fact that "such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities," in violation of **42 U.S.C. § 12182(b)(2)(A)(ii)** and **28 C.F.R. § 36.302(a)**.  For instance, <u>Defendant has **no** enforcement procedure to ensure that accessible parking is used only by those who need it</u>—<u>to the contrary, **Live Nation's official policy is that patrons are not required to have or present a Disabled Person (DP) placard in order to park in the accessible parking spaces located in Lots C and D**</u>.[53]  Unlike Lots A and B, Lots C and D are located directly outside of, and adjacent

---

[53] *See* Live Nation, Venues: Shoreline Amphitheatre, *Know Before You Go*, *available at* https://www.livenation.com/venue/KovZpZA6ta1A/shoreline-amphitheatre-events#know-before-you-go ("Accessible Parking is located in C & D parking lots. Let the parking staff know that you need accessible parking and they will direct you to this lot. **You do not need to have an accessible placard in order to park in this lot**, but please be advised that parking is limited. Overflow ADA parking is available in Lot A off of Shoreline Blvd. … If you do not absolutely need accessible parking, please park in the general lots.") (emphasis added)

to, the amphitheater building.  And unlike in Lot A, the accessible parking spaces in Lots C and D are designated by markings denoting the location and dimensions of such spaces.  Based on those markings, it is further clear that the accessible parking spaces in Lots C and D are located at the very forefront of those lots.  Thus, the accessible parking spaces in Lots C and D are closer to the amphitheater building entrance than any other parking spaces in any of the four parking lots on the Shoreline Site, including the spaces reserved for VIPs and patrons that paid extra for Premier Parking.  In other words, the accessible parking spaces in Lots C and D are the best parking spaces in the Shoreline Site.  They are highly desirable to disabled and nondisabled persons alike.  As a result, **the practical effect of Live Nation's policy regarding disability placards is that non-disabled persons may, and do, freely park in the accessible parking spaces in Lots C and D**. In turn, the limited number of ADA-compliant spaces in Lots C and D quickly fill up, at which point most or all disabled patrons are relegated to the "Overflow ADA parking" of Lot A, which (as discussed throughout) are riddled with architectural barriers.  Thus, Defendant's lack of enforcement method to ensure that accessible parking is only used by disabled persons who need it results in the systematic denial of Defendant's services, facilities, privileges, advantages, and/or accommodations to disabled persons.  Thus, a modification in Defendant's policies, practices, and/or procedures is necessary.  Such a modification may consist of implementation of a policy to check periodically for violators and report them to the proper authorities.[54]

          d.       Defendant has "fail[ed] to remove [the above-listed] architectural barriers," despite the fact that "such removal is readily achievable," in violation of **42 U.S.C. § 12182(b)(2)(A)(iv)** and **28 C.F.R. § 36.304(a)**.[55]

---

[54] *See ADA Checklist for Readily Achievable Barrier Removal*: *Checklist for Existing Facilities version 2.1*, *supra* ("Is there an enforcement procedure to ensure that accessible parking is used only by those who need it?  POSSIBLE SOLUTIONS: **Implement a policy to check periodically for violators and report them to the proper authorities**.") (emphasis added).

[55] For instance, Defendant could easily and cheaply add markings and/or striping to the surface of Lot A to denote the existence, locations, and dimensions of the accessible parking spaces and adjacent access aisles, thereby bringing Lot A into compliance with 1991 Standards §§ 4.1.2(5)(a), 4.6.3 and 2010 Standards §§ 502.1, 502.2, 502.3, 502.3.1, 502.3.2, 502.3.3, 502.7.  *See* ADA.gov, *ADA Compliance Brief: Restriping Parking Spaces* (originally issued Dec. 1, 2015; last updated Feb. 28, 2020), *available at* https://www.ada.gov/resources/restriping-parking-spaces/ ("[B]usinesses or privately owned facilities that provide goods or services to the public have a

e.      Additionally, to the extent removal of any of the above-described architectural barriers "is not readily achievable," Defendant has also "fail[ed] to make [its] goods, services, facilities, privileges, advantages, or accommodations available through alternative methods" despite the fact that such measures would be "readily achievable," in violation of **42 U.S.C. § 12182(b)(2)(A)(v)** and **28 C.F.R. § 36.305(a)**.[56]

f.      In the course of making alterations to the Shoreline Site that "affect[] or could affect the usability of" Lot A, Defendant "fail[ed] to make alterations in such a manner that, to the maximum extent feasible, the altered portions of the facility are readily accessible to and usable by individuals with disabilities, including individuals who use wheelchairs," in violation of **42 U.S.C. § 12183(a)(2)** and **28 C.F.R. § 36.402(a)(1)**.

g.      Defendant also "undert[ook] an alteration that affects or could affect usability of or access to an area of the facility containing a primary function"—namely, Lot A— but it failed to "make the alterations in such a manner that, to the maximum extent feasible, the path of travel to the altered area and the bathrooms, telephones, and drinking fountains serving the

---

continuing ADA obligation to remove barriers to access in existing parking facilities when it is readily achievable to do so.  <u>Because restriping is relatively inexpensive, it is readily achievable in most cases</u>.") (emphasis added).

*See also* 28 C.F.R. § 36.304(b)(18) ("Examples of steps to remove barriers include, but are not limited to, the following actions … (18) **Creating designated accessible parking spaces**[.]") (emphasis added); *see also id.* § 36.304(c) ("A public accommodation is urged to take measures to comply with the barrier removal requirements of this section <u>in accordance with the following order of priorities</u>. (1) **First, a public accommodation should take measures to provide access to a place of public accommodation from public sidewalks, parking, or public transportation. These measures include, for example, … <u>providing accessible parking spaces</u>**. (2) Second, a public accommodation should take measures to provide access to those areas of a place of public accommodation where goods and services are made available to the public. … (3) Third, a public accommodation should take measures to provide access to restroom facilities. … (4) Fourth, a public accommodation should take any other measures necessary to provide access to the goods, services, facilities, privileges, advantages, or accommodations of a place of public accommodation.") (emphasis added).

[56] For instance, while it is not feasible for Defendant to move Lot A, itself, any closer to the amphitheater building such that the purportedly accessible parking spaces in Lot A could be considered to be "located on the shortest accessible route of travel" to the amphitheater building's accessible entrance, as the ADA requires (1991 Standards § 4.6.2; 2010 Standards § 208.3.1), the ADA's implementing regulations explicitly identify "[r]elocating activities to accessible locations" as one "[e]xample[] of [an] alternative[] to barrier removal" for purposes of 28 C.F.R. § 36.305(a) and U.S.C. § 12182(b)(2)(A)(v).  *See* 28 C.F.R. § 36.305(b)(3) ("Examples of alternatives to barrier removal include, but are not limited to, the following actions … (3) Relocating activities to accessible locations[.]").

altered area, are readily accessible to and usable by individuals with disabilities," in further

violation of **42 U.S.C. § 12183(a)(2)**, as well as of **28 C.F.R. § 36.403(a)(1)**.

h.    In light of the above-described conditions—particularly, Lot A's unstable ground surface of (*i.e.*, loose gravel with particles that move freely as patrons traverse it), as well as the lack of striping or markings on the ground surface to denote the width of accessible parking spaces and the existence and dimensions of adjacent access aisles—Defendant has failed to maintain in operable working condition those features of Lot A that are required to be readily accessible to and usable by persons with disabilities at the Shoreline Site, in violation of the ADA implementing regulation under **28 C.F.R. § 36.211(a)**.

73.    In sum, Defendant's conduct with respect to the Shoreline Site, and particularly Lot A thereon, violates the ADA pursuant to Sections 12182(b)(1)(A)(i), 12182(b)(2)(A)(ii), 12182(b)(2)(A)(iv), 12182(b)(2)(A)(v), and 12183(a)(2), and the ADA's implementing regulations under 28 C.F.R. §§ 36.202(a), 36.211(a), 36.302(a), 36.304(a), 36.304(d)(1), 36.304(d)(2)(ii)(B), 36.305(a), 36.402(a)(1), 36.403(a)(1), and 36.406(a). **Defendant's failure to comply with each of these provisions constitutes an independent violation of the general rule against discrimination set forth under 42 U.S.C. § 12182(a) and 28 C.F.R. § 36.201(a).**

74.    For the same reasons, Defendant "also violated the Unruh Act, as '[a] violation of the right of any individual under the [ADA] shall also constitute a violation of this section.'" *Hurley v. Loma Linda Univ. Med. Ctr.*, 2014 WL 580202, at *9 (C.D. Cal. Feb. 12, 2014) (citing Cal. Civ. Code § 51(f)).  Thus, each and every violation of the ADA also constitutes a separate and distinct violation of the Unruh Act, thus independently justifying an award of damages and injunctive relief pursuant to California law, including Cal. Civ. Code §§ 55, 52(a).

75.    Likewise, "Defendant[ has] violated the California Disabled Persons Act because '[a] violation of the right of an individual under the [ADA] also constitutes a violation of this section,' Cal. Civ. Code § 54(c), and the [Shoreline Amphitheatre is a] … facility open to the general public, *see id*. § 54.1(a)(1)."  *Hurley*, 2014 WL 580202, at *10; *see also Baskin v. Hughes Realty, Inc.*, 25 Cal. App. 5th 184, 191–93 (2018) ("Sections 54 and 54.1 incorporate the ADA's protections against discrimination.  Each provision states: 'A violation of the right of an individual

under the [ADA] also constitutes a violation of this section.'  Because the ADA requires the modification of facilities to remove barriers to access whenever 'removal is readily achievable,' sections 54 and 54.1 incorporate that requirement with respect to barriers to access identified in the ADA regulations.") (internal quotation marks and citations omitted).  Thus, each and every violation of the ADA constitutes a separate and distinct violation of the CDPA, thus independently justifying an award of damages and injunctive relief pursuant to California law, including but not limited to Cal. Civ. Code § 54.3.

76. Thus, Defendant has discriminated against Plaintiff, and other similarly situated mobility impaired persons, by denying access to full and equal enjoyment of the goods, services, facilities, privileges, advantages and/or accommodations of its place of public accommodation or commercial facility in violation of the ADA, Unruh Act, and CDPA.

77. Plaintiff personally encountered the above-described architectural barriers when she visited the Shoreline Site on September 27, 2022.

78. The inaccessibility of the Shoreline Site denied Plaintiff full and equal access and caused her difficulty, discomfort, and embarrassment.

79. Plaintiff and other similarly situated mobility impaired persons will continue to suffer discrimination, injury, and damage without the immediate relief provided for by the ADA, Unruh Act, and CDPA, and requested herein.

80. Plaintiff lives in the area and would like to return and patronize Shoreline Amphitheatre to see events there featuring other musicians and shows she enjoys.  However, Plaintiff is deterred from visiting Shoreline Amphitheatre again until Defendant removes the barriers described above.

81. The barriers identified above are easily removed without much difficulty or expense.  They are the types of barriers identified by the Department of Justice as presumably readily achievable to remove and, in fact, these barriers are readily achievable to remove.

Moreover, there are numerous alternative accommodations that could be made to provide a greater level of access if complete removal were not achievable.[57]

82.     A common barrier removal project would be to reseal, repave, or resurface[58] the loose gravel of Lot A so that persons with mobility limitations, like Plaintiff, do not risk injury by slipping as a result of the loose gravel particles that are kicked up as the surface is traversed.[59]  It would also be quick, easy, and cheap to add striping or markings to the surface of Lot A to denote the existence, locations, and dimensions of the accessible parking spaces and adjacent access

---

[57] *See, e.g.*, 8 C.F.R. § 36.305(b)(3) ("Examples of alternatives to barrier removal include, but are not limited to, the following actions … (3) Relocating activities to accessible locations[.]").

[58] *See* https://mcconnellassociates.org/a-complete-guide-to-parking-lot-resurfacing/ ("Resealing, which involves adding a new layer of sealcoat to the parking lot without laying down a new coat of asphalt, is the least intensive repair.  Repaving, which involves removing all the old pavement, replacing it with a whole new layer of asphalt, and then sealcoating it, is the most intensive parking lot repair.  Resurfacing is the 'in-between' option, which involves adding a new layer of asphalt to the existing pavement surface.  For most parking lots, which need more than a fresh coat of sealcoating but don't need to be fully repaved, resurfacing is 'just right.'  Parking lot resurfacing adds a new layer of asphalt about 2 inches deep.  This makes the parking lot look like new by repairing wear and tear that accumulates over years of use and is a cost-effective way to add up to 15 years of lifespan to your parking lot.").

*See also* ADA.gov, *ADA Checklist for Readily Achievable Barrier Removal*: *Checklist for Existing Facilities version 2.1*, https://archive.ada.gov/racheck.pdf ("Is the route of travel stable, firm and slip-resistant? POSSIBLE SOLUTIONS: **Repair uneven paving. Fill small bumps and breaks with beveled patches. Replace gravel with hard top.**") (emphasis added).

[59] U.S. Access Board, *Guide to the ADA Accessibility Standards*, Chapter 3: Floor and Ground Surfaces, https://www.access-board.gov/ada/guides/chapter-3-floor-and-ground-surfaces/ ("Accessible surfaces must be slip resistant to minimize hazards to people with disabilities, especially those who are ambulatory or semi-ambulatory or who use canes, crutches, and other walking aids."); *see also id.* ("This guide explains requirements in the ADA Standards for floor and ground surfaces. … Accessible floor and ground surfaces must be stable, firm, and slip resistant. … ***Most loose materials, including gravel will not meet these requirements unless properly treated to provide sufficient surface integrity and resilience.***") (italics in original; bolding and underlining added for emphasis); *id.* ("Concrete, asphalt, and other paved surfaces are more reliably compliant, but other materials, such as wood, and construction methods can be used to provide firm and stable surfaces.  **Loose material like gravel will not perform adequately unless it is sufficiently stabilized** by binders, compaction, or other treatments and will likely require repeated maintenance.") (emphasis added); *id.* ("Rough surfaces … can be difficult and sometimes painful to negotiate with wheeled mobility aids due to the vibrations they cause.").

*See also* https://www.online-pdh.com/file.php/418/DPS_SG_Online-PDH_.pdf ("The surface of accessible spaces and access aisles must be smooth, stable, and virtually level in all directions to ensure safe use for people with disabilities, including those who must load, unload, and use wheeled mobility devices. … Accessible parking spaces should be located where the surface is firm and stable. … **Loose … gravel … areas are too difficult to travel across for many people using wheelchairs or those who walk with difficulty.**") (emphasis added).

1  aisles.[60]  Further, painting stripes would also remedy the lack of an adequate number of accessible

2  parking spaces by reconfiguring Lot A to include a reasonable number of spaces.[61]  Another

3  readily achievable measure Defendant could take to remediate the architectural barriers of Lot A is

4  to add ADA-compliant signage regarding accessible parking.[62]  These are simple construction

5  tasks that are well within the capabilities of any general contractor and can be completed relatively

6  easily, quickly, and for a modest price.[63]

7         83.     Plaintiff is deterred from returning and patronizing the Shoreline Site because of her

8  knowledge of the barriers that exist.  Plaintiff will, nonetheless, return to assess ongoing

9  compliance with the ADA and will return to patronize the Shoreline Site as a customer once the

10  barriers are removed.

11         84.     Given the obvious and blatant nature of the violations and barriers alleged herein,

---

[60] *See* ADA.gov, *ADA Compliance Brief: Restriping Parking Spaces* (originally issued Dec. 1, 2015; last updated Feb. 28, 2020), *available at* https://www.ada.gov/resources/restriping-parking-spaces/ ("Because restriping is relatively inexpensive, it is readily achievable in most cases."); *see also* https://ada-striping.com/parking-lots/ ("Resurfacing or Asphalt overlay is the most common and economical to extend the life of asphalt driveways, parking lot area of any property.").

[61] *See* ADA.gov, *ADA Checklist for Readily Achievable Barrier Removal*: *Checklist for Existing Facilities version 2.1*, https://archive.ada.gov/racheck.pdf ("Are an adequate number of accessible parking spaces available (8 feet wide for car plus 5-foot access aisle)?  POSSIBLE SOLUTIONS: **Reconfigure a reasonable number of spaces by repainting stripes**.") (emphasis added); *see also id*. ("Are the accessible spaces closest to the accessible entrance? POSSIBLE SOLUTIONS: Reconfigure spaces.").  *See also* 8 C.F.R. § 36.304(c)(1) ("First, a public accommodation should take measures to provide access to a place of public accommodation from … parking[.] … These measures include, for example, … providing accessible parking spaces.").

[62] *See* ADA.gov, *ADA Checklist for Readily Achievable Barrier Removal*: *Checklist for Existing Facilities version 2.1, supra* ("Are accessible spaces marked with the International Symbol of Accessibility? … POSSIBLE SOLUTIONS: **Add signs, placed so that they are not obstructed by cars**.") (emphasis added).

[63] *See also, e.g.*, *Camden Sys., LLC v. Young*, 2024 WL 106910, at *5 (Cal. Ct. App. Jan. 10, 2024), *reh'g denied* (Jan. 29, 2024), *review denied* (Mar. 27, 2024) ("'This Court finds it plausible that **removing the alleged barriers is readily achievable, including modifying parking lot spaces[] … and adding … accessible [] signs**.'") (emphasis added); *see also Melo v. S. Broadway L. Realty Tr.*, 2016 WL 393258, at *1-2 (D. Mass. Feb. 1, 2016) ("[Plaintiff] allegedly encountered multiple violations of the ADA and the ADA's Accessibility Guidelines (the 'ADAAG'), 28 C.F.R. Part 36[,] … include[ing] **insufficient and noncompliant accessible parking**; **lack of access aisles and routes**; … a lack of … signage; [and] obstructions in the floor space[.] … Here, the complaint alleges that … removal of [each] barrier is 'readily achievable and can be accomplished and carried out without much difficulty or expense.'  Given the nature of the violations alleged, that is at least plausible.") (internal citation and footnote omitted, emphasis added); *id*. at *2 n.1 ("For example, the complaint alleges that 'the designated accessible parking spaces do not have a sign identifying it as an accessible parking space as required,' and that the 'designated accessible parking space and access aisle have faded paint.'") (citation omitted).

Plaintiff alleges, on information and belief, that there are other violations and barriers on the site that relate to her disability.  Plaintiff will amend the Complaint to provide proper notice regarding the scope of this lawsuit once a full site inspection is conducted by an expert surveyer.  However, please be on notice that Plaintiff seeks to have all barriers related to his disability remedied.  *See Doran v. 7-11*, 524 F.3d 1034 (9th Cir. 2008) (holding that once a plaintiff encounters one barrier at a site, she can sue to have all barriers that relate to [her] disability removed regardless of whether [s]he personally encountered them).

85.     These barriers to access render the premises inaccessible to and unusable by physically disabled persons.  All facilities must be brought into compliance with all applicable federal and state code requirements, according to proof.

86.     Plaintiff is without adequate remedy at law and is suffering irreparable harm, including bodily injury consisting of emotional distress, mental anguish, suffering, and humiliation.  Considering the balance of hardships between the Plaintiff and the Defendant, a remedy in equity is warranted.  The public interest would not be disserved by the issuance of a permanent injunction.

87.     Based on the above ADA violations and pursuant to 42 U.S.C. § 12188(a)(2), Plaintiff seeks, individually and on behalf of all others similarly situated, a permanent injunction requiring that:

a.     Defendant take all steps necessary to bring the Shoreline Site into full compliance with the requirements set forth in the ADA, and its implementing regulations, including, *inter alia*, by removing the architectural barriers as described herein and modifying its policies, practices, or/and procedures regarding disability parking, *e.g.*, by implementing an enforcement procedure to ensure that accessible parking is used only by those who need it.

b.     Plaintiff's representatives monitor Defendant's facilities to ensure the injunctive relief ordered pursuant to Subparagraph (a) above has been implemented and will remain in place.

88.     Plaintiff also seeks, individually and on behalf of all others similarly situated, injunctive relief under the Unruh Act, as well as statutory damages equal to not less than $4,000 per violation, per Class Member.  *See* Cal. Civ. Code §§ 55, 52(a).

89.     In the alternative, Plaintiff, individually and on behalf of all others similarly situated, seeks statutory damages under the CDPA equal to not less than $1,000 per violation, per Class Member.  *See* Cal. Civ. Code § 54.3.

## CLASS ACTION ALLEGATIONS

90.     ***Class and Subclass Definition***.  Plaintiff brings this action pursuant to Rules 23(a) and 23(b)(2) of the Federal Rules of Civil Procedure on behalf of Classes and Subclasses of similarly situated individuals, defined as follows:

(a)     ***Nationwide Class.***  Plaintiff seeks to represent a class of similarly situated individuals, defined as all persons in the United States with a physical disability who use wheelchairs, canes, crutches, braces, and/or walkers for mobility purposes and who, within the applicable statute of limitations period, up to and including the date of final judgment in this action, visited Shoreline Amphitheatre and personally encountered one or more architectural barrier on the Shoreline Site (the "Nationwide Class").

(b)     ***California Subclass.***  Plaintiff also seeks to represent a subclass comprised of all Class Members residing in California who, within the applicable statute of limitations period, up to and including the date of final judgment in this action, visited Shoreline Amphitheatre and personally encountered one or more architectural barrier on the Shoreline Site (the "California Subclass").

91.     Excluded from the Class and Subclass are: (1) Defendant and its officers, directors, employees, principals, affiliated entities, controlling entities, and other affiliates; (2) the agents, affiliates, legal representatives, heirs, attorneys at law, attorneys in fact, or assignees of such persons or entities described herein; and (3) the Judge(s) assigned to this case and any members of their immediate families.

92.     Plaintiff reserves the right to amend the definition of the Class and Subclass if discovery or further investigation reveals that the Class and/or Subclass should be expanded or

1    otherwise modified.

2    93.    The Nationwide Class seeks preventive relief, including an application for a

3    permanent or temporary injunction, restraining order, or other order that will prevent Defendant

4    from continuing its violations of the ADA, *see* 42 U.S.C. § 12188(a); 42 U.S.C § 2000a–3, as well

5    as an award of costs and reasonable attorneys' fees, *see* 42 U.S.C. § 12188(b).  Additionally, the

6    California Subclass seeks class wide damages pursuant to the Unruh Act, Cal. Civ. Code § 52(a),

7    in the amount of $4,000 per violation, and, pursuant to the CDPA, Cal. Civ. Code § 54.3, in the

8    amount of $1,000 per violation, based on Defendant's failure to provide full and equal access to

9    disabled Californians as alleged herein.

10    94.    This action should be certified as a class action under Rules 23(a) and (b)(2) of the

11    Federal Rules of Civil Procedure for the Nationwide Class and California Subclass because the

12    Class and Subclass each satisfy the class action prerequisites of numerosity, commonality,

13    typicality, and adequacy, as described below.

14    95.    ***Numerosity.***  Members of the Class and Subclass are so numerous that their

15    individual joinder herein is impracticable.  On information and belief, the Nationwide Class and

16    California Subclass each comprise at least thousands of disabled individuals throughout the United

17    States and California, respectively, who have been harmed and suffered discrimination due to

18    Defendant's failure to comply with the ADA's requirements.  The precise number of Class and

19    Subclass members and their identities are unknown to Plaintiff at this time but may be determined

20    through discovery.  Class and Subclass members may be notified of the pendency of this action by

21    mail and/or publication through the distribution records of Defendant.

22    96.    ***Commonality and Predominance***.  There is a well-defined community of interest

23    and common questions of law and fact exist as to all Class and Subclass members and predominate

24    over questions affecting only individual Class and Subclass members.  Specifically, all Class and

25    Subclass members have been denied their civil rights to full and equal access to, and use and

26    enjoyment of, Defendant's facilities and/or services due to Defendant's failure to comply with

27    federal and state law as described above.  Common legal and factual questions include, but are not

28    limited to: whether Plaintiff is disabled within the meaning of the ADA, Unruh Act, Section 504,

and the CDPA; whether Defendant operates a place of public accommodations; whether Defendant's policies regarding disability parking, architectural barriers, and other unlawful conduct as alleged herein comply with the provisions of Title III of the ADA, 42 U.S.C. §§ 12101, *et seq.*; whether Defendant's policies and practices comply with the provisions of California's Unruh Act, Cal. Civ. Code §§ 51, *et seq.*; whether Defendant's policies and practices comply with the provisions of California's CDPA, Cal. Civ. Code §§ 54, *et seq.*; whether Defendant should be enjoined from further engaging in the misconduct alleged herein; whether Plaintiff and members of the Class and Subclass are entitled to statutory damages pursuant to the Unruh Act and/or CDPA; and whether Plaintiff and members of the Class and Subclass are entitled to attorneys' fees and costs.  The Class issues fully predominate over any individual issue because no inquiry into individual conduct is necessary; all that is required is a narrow focus on Defendant's encounters with disabled individuals seeking accommodations in their facilities.

97.     ***Typicality.***  The claims of Plaintiff are typical of the claims of the Class and Subclass in that Plaintiff and members of the Class and Subclass were injured as a result of Defendant's uniform wrongful conduct, based upon Defendant's unlawful policy and practice of failing to provide full and equal access to disabled individuals in the United States and California as alleged herein.

98.     ***Adequacy***.  Plaintiff will fairly and adequately protect Class and Subclass members' interests.  Plaintiff has no interests antagonistic to Class and Subclass members' interests, and Plaintiff has retained counsel that have considerable experience and success in prosecuting complex class actions and consumer protection cases.

99.     ***Superiority***.  A class action is superior to all other available methods for the fair and efficient adjudication of this controversy for, *inter alia*, the following reasons: prosecutions of individual actions are economically impractical for members of the Class; the Class is readily definable; prosecution as a class action avoids repetitious litigation and duplicative litigation costs, conserves judicial resources, and ensures uniformity of decisions; and prosecution as a class action permits claims to be handled in an orderly and expeditious manner.

100.     Additionally, class certification of the Nationwide Class and California Subclass is

appropriate under Fed. R. Civ. Proc. 23(b)(2) because Defendant has acted on or refused to act on grounds generally applicable to the Class and Subclass, making appropriate declaratory, injunctive, and equitable relief with respect to the Plaintiff and the Class and Subclass as a whole.

101.     Without a class action, Defendant will continue a course of action that will result in further injury to Plaintiff and members of the Class and Subclass, and will likely retain the benefits of their wrongdoing.

102.     Based on the foregoing allegations, Plaintiff's claims for relief include those set forth below.

**COUNT I**
**Violations of Title III of the Americans with Disabilities Act of 1990 ("ADA"),**
**42 U.S.C. §§ 12101, *et seq.***
**(On Behalf Of The Nationwide Class And California Subclass)**

103.     Plaintiff re-alleges and incorporates by reference every allegation set forth in the preceding paragraphs as though alleged in this Count.

104.     Plaintiff brings this claim individually and on behalf of the members of the proposed Nationwide Class and California Subclass against Defendant.

105.     At all times relevant to the action, Plaintiff has suffered from an ADA-qualifying disability that impairs her mobility and requires the use of mobility devices.  *See supra*; 42 U.S.C. § 12102(1)(A).  Plaintiff's physical impairment substantially limits several of her "major life activities" and "major bodily functions," as described above.  42 U.S.C. § 12102(2)(A)-(B).

106.     Defendant leases and operates the Shoreline Site, which is a place of public accommodation within the meaning of Title III of the ADA, 42 U.S.C. § 12181(7)(C) ("a motion picture house, theater, concert hall, stadium, or other place of exhibition or entertainment").

107.     Accordingly, Defendant is subject to the requirements and prohibitions of the ADA, including, *inter alia*, the general prohibition of discrimination under 42 U.S.C. § 12182(a), the rule against denials of participation under 42 U.S.C. § 12182(b)(1)(A)(i), the requirements regarding "reasonable modifications in policies, practices, or procedures" under 42 U.S.C. § 12182(b)(2)(A)(ii), the "readily achievable" barrier removal requirements under 42 U.S.C. §

12182(b)(2)(A)(iv)-(v), and "readily accessible" requirements under 42 U.S.C. § 12183(a)(2), as well as parallel and related implementing regulations. *See, e.g.*, 28 C.F.R. §§ 36.202(a) (denial of participation), 36.302 (modifications in policies, practices, or procedures), 36.304 (removal of barriers), 36.305 (alternatives to barrier removal); *id.* §§ 36.402 (alterations), 36.403 (alterations: path of travel), 36.406 (standards for new construction and alterations); *id.* § 36.211(a) ("A public accommodation shall maintain in operable working condition those features of facilities and equipment that are required to be readily accessible to and usable by persons with disabilities[.]").

108.    In addition to these general requirements and prohibitions of the ADA's statutory provisions and implementing regulations, the Shoreline Site, including the Lot A, must also comply with the applicable version of the ADA Standards for Accessible Design ("ADAAG")—either the 1991 or 2010 versions of the (the "1991 Standards" and the "2010 Standards," respectively)—depending on the date of construction of the Shoreline Site and/or last alteration to the Shoreline Site or a portion thereof that affects or could affect the usability of Lot A and/or the elements therein that are at issue in this case.[64]  Here, the 2010 Standards apply because, on information and belief, physical construction for the most recent alteration to the Shoreline Site affecting the usability of Lot A began after March 14, 2012.  Moreover, even if it is ultimately revealed that the Shoreline Site has *not* undergone any alteration since that date, the elements of Lot A at issue here must nevertheless be modified to the extent readily achievable to comply with the requirements set forth in the 2010 Standards based on its noncompliance with the 1991 Standards as described herein.[65]  Nevertheless, discovery in this matter will reveal ultimately if

---

[64] In particular, if the last alteration began on or after January 26, 1993, but before September 15, 2010, then the altered portion of the Shoreline Site must comply with the 1991 Standards. *See* 28 C.F.R. § 36.406(a)(1).  If the last alteration began after September 15, 2010, but before March 15, 2012, then then it may comply with *either* the 1991 Standards *or* the 2010 Standards.  *See id.* § 36.406(a)(2).  And if physical construction for the last alteration began on or after March 15, 2012, the 2010 Standards apply to the altered portion.  *See id.* § 36.406(a)(3).

[65] Facilities that were altered "before March 15, 2012 and that do not comply with the 1991 Standards shall, on or after March 15, 2012, be made accessible in accordance with the 2010 Standards." *See* 28 C.F.R. § 36.406(a)(5)(ii); *accord* 28 C.F.R. § 36.304(d)(2)(ii)(B) ("On or after March 15, 2012, elements in existing facilities that do not comply with the corresponding technical and scoping specifications for those elements in the 1991 Standards must be modified to the extent readily achievable to comply with the requirements set forth in the 2010 Standards.  Noncomplying newly constructed and altered elements may also be subject to the requirements of § 36.406(a)(5).").

and when such alterations have taken place at the Property, which will determine which version of the ADAAG applies and, correspondingly, which specific technical and scoping rules Defendant must meet/exceed to bring the Property into compliance with the ADA.

109.    Plaintiff visited the Shoreline Site on September 27, 2022, and she personally encountered and was injured by numerous architectural barriers during her visit to the Property. For instance, the poorly maintained ground surface of Lot A is made of loose gravel, and gravel particles move freely as patrons move across it.  Thus, the ground surface of Lot A is <u>not</u> stable, firm, or slip-resistant.  These features presented Plaintiff with a tipping hazard that risked both bodily injury and damage to her wheelchair.  Additionally, the purportedly accessible parking spaces and adjacent access aisles of Lot A are not marked, and they are not sufficiently wide or long and/or lack the dimensions required.  Lot A also fails to provide the requisite number of compliant accessible parking spaces or designate these spaces with signage.  Furthermore, the purportedly accessible parking spaces within Lot A are not located on the shortest accessible route of travel to the amphitheater building's accessible entrance, and Defendant has failed to provide an accessible route between those spaces and the "Accessibility Shuttle pick-up and drop-off zone" in the northwest corner of Lot A.

110.    The remediation of each of these architectural barriers is both technically feasible and readily achievable.

111.    As a result of these barriers, and, *inter alia*, Defendant's failure to remove them, Defendant has discriminated against Plaintiff and other similarly situated mobility-impaired person by denying access to, and full and equal enjoyment of, the goods, services, facilities, privileges, advantages and/or accommodations of the Shoreline Site, as prohibited by the ADA.  *See* 42 U.S.C. § 12182(a) (General Rule); *accord* 28 C.F.R. § 36.201(a).

112.    Specifically, Defendant has violated, and continues to violate, the General Rule under Section 12182(a) based on systematic failure to comply with following ADA provisions:

        a.    42 U.S.C. § 12182(b)(1)(A)(i), in that Defendant has "subject[ed] an individual or class of individuals [Plaintiff and putative Class Members] on the basis of a disability …, to a denial of the opportunity of the individual or

1        class to participate in or benefit from the goods, services, facilities,

2        privileges, advantages, or accommodations of" the Shoreline Site;

3    b.    42 U.S.C. § 12182(b)(2)(A)(ii), in that Defendant has "fail[ed] to make

4        reasonable modifications in policies, practices, or procedures, when such

5        modifications are necessary to afford such goods, services, facilities,

6        privileges, advantages, or accommodations to individuals with disabilities"

7        and would not "fundamentally alter the nature of such goods, services,

8        facilities, privileges, advantages, or accommodations;"

9    c.    42 U.S.C. § 12182(b)(2)(A)(iv), in that Defendant has "fail[ed] to remove

10        architectural barriers … in existing facilities … where such removal is

11        readily achievable;"

12    d.    42 U.S.C. § 12182(b)(2)(A)(v), to the extent removal of any of the above-

13        described barriers is not readily achievable, in that Defendant has "fail[ed]

14        to make [the] goods, services, facilities, privileges, advantages, or

15        accommodations [of the Shoreline Site] available through alternative

16        [readily achievable] methods[;]" and

17    e.    42 U.S.C. § 12183(a)(2), with respect to alterations to Shoreline Site that

18        "affect[] or could affect the usability of the" Lot A on the Shoreline Site, in

19        that (among other things) Defendant has "fail[ed] to make alterations in such

20        a manner that, to the maximum extent feasible, the altered portions of the

21        facility are readily accessible to and usable by individuals with disabilities,

22        including individuals who use wheelchairs."

23    113.    Based on the same conduct, Defendant also violates several of ADA implementing

24    regulations, including but not limited to 28 C.F.R. §§ 36.202(a), 36.211(a), 36.302(a), 36.304(a),

25    36.304(d)(1), 36.304(d)(2)(ii)(B), 36.305(a), 36.402(a)(1), 36.403(a)(1), and 36.406(a).

26    114.    Each of the architectural barriers described above is also a violation of the

27    corresponding technical and scoping specifications for those elements in all versions of the

28

ADAAG that may apply to the Shoreline Site.[66]  In other words, based on the conditions of Lot A as described above, Defendant fails to comply with either the 1991 Standards *or* the 2010 Standards.  In particular, Defendant violates the requirements of the 1991 Standards pursuant to Sections 4.1.2, 4.3.1, 4.3.2, 4.3.6, 4.5.1, 4.6.1, 4.6.2, 4.6.3, 4.6.4, and 4.30.7; *and* the 2010 Standards pursuant to Sections 206, 208, 216.5, 302.1, 403.2, 502, 703.2.1.  *See supra* ¶ 67 (describing ADAAG violations in detail).  Thus, while Plaintiff is informed and believes that the 2010 Standards apply based on alteration(s) initiated after March 14, 2012, *see supra*, Lot A violates the ADAAG regardless of which version of which version may apply.

115.    The discriminatory violations described above may not be an exhaustive list of the ADA violations that exist at the Property, but they are the result of a preliminary inspection conducted by the Plaintiff and her representatives and include all those architectural barriers personally encountered by Plaintiff.  Plaintiff requires thorough inspection of the Defendant's place of public accommodation in order to comprehensively identify, photograph, and measure the architectural barriers that exist at the Shoreline Site in violation of the ADA.

116.    As a result of Defendant's unlawful discriminatory conduct, Plaintiff and similarly situated mobility impaired persons have suffered and will continue to suffer discrimination, injury, and damage without the immediate relief provided for by the ADA and requested herein.

117.    Defendant continues to discriminate against Plaintiff and similarly situated mobility impaired persons in "the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of" the Shoreline Site, in violation of the ADA's general rule under Section 12182(a), by, *inter alia*, failing to: make reasonable and necessary modifications in its policies, practices, or procedures concerning disability parking, *e.g.*, by implementing an enforcement mechanism to ensure that accessible parking spaces in the parking facilities adjacent to the Shoreline Site (including Lot A) are used only by those who need them, *see* 42 U.S.C. § 12182(b)(2)(A)(ii); remove architectural barriers to the extent readily achievable, *see id.* § 12182(b)(2)(A)(iv); make the goods, services, facilities, privileges, advantages, or

---

[66] *See* 28 C.F.R. § 36.406(a)(1)-(5).

accommodations of the Shoreline Site and/or Lot A available through alternative methods to the extent readily achievable, *see id*. § 12182(b)(2)(A)(v); and make alterations in such a manner that, to the maximum extent feasible, the altered portions of the Shoreline Site are readily accessible to and usable by individuals with disabilities, including individuals who (like Plaintiff) use wheelchairs, *see id*. § 12183(a)(2).

118.    Plaintiff seeks injunctive relief to prohibit Defendant's acts and failures to act as complained of herein, which are continuing on a day-to-day basis and which have the effect of wrongfully excluding Plaintiff and other members of the public who are physically disabled, including but not limited to wheelchair users, from full and equal access to these public facilities.

119.    Such acts and omissions are the cause of humiliation to, and the mental and emotional suffering of, Plaintiff, in that these actions continue to treat Plaintiff as an inferior and second-class citizen and serve to discriminate against her on the sole basis that she is a person with disabilities who requires the use of a wheelchair and other mobility devices for movement in public places.

120.    Plaintiff lives generally nearby the Property and would like to return to and patronize Shoreline Amphitheatre in the future to see other shows and events to be held there.

121.    However, Plaintiff and other similarly situated physically disabled persons, including non- and semi-ambulatory individuals who require the use of wheelchairs, canes, crutches, braces, and/or walkers for mobility, are unable to use Defendant's facilities on a "full and equal" basis unless and until the Shoreline Site is brought into compliance with the requirements of the ADA, including the scoping and technical requirements of the applicable ADAAG standards.

122.    That is, Plaintiff is unable, so long as Defendant's unlawful and discriminatory conduct continues, to achieve full and equal access to and use of these public facilities, and she cannot return to patronize the Shoreline Site without risk of further injury until the Site, including Lot A, is made properly accessible to disabled persons.

123.    Plaintiff is deterred from visiting Shoreline Amphitheatre again until Defendant removes the architectural barriers described above.  Plaintiff is deterred from returning and patronizing the Shoreline Site because of her knowledge of the barriers that exist.

124.     Plaintiff intends to, and will, return to patronize the Shoreline Site as a customer once the architectural barriers are removed and legally required access has been provided.

125.     Plaintiff seeks injunctive relief as to all areas of the premises that she personally encountered.  Further, Plaintiff seeks injunctive relief as to all non-ADA-compliant areas of the Shoreline Site that exist and/or that Plaintiff or other physically disabled persons may encounter in the future, including any all barriers identified before or during this litigation by Plaintiff's access consultant.  *See Doran v. 7-Eleven, Inc.*, 524 F.3d 1034 (9th Cir. 2008); *Chapman v. Pier one Imports (USA), Inc.*, 631 F.3d 939 (9th Cir. 2011); General Order No. 56 (N.D. Cal. requirements for Title III ADA cases) § 7 (Joint Site Inspection).

126.     As set out above, absent injunctive relief, there is a clear risk that the architectural barriers described above, and Defendant's discriminatory actions, inactions, policies, practices, and procedures will recur with Plaintiff and other disabled individuals seeking Defendant's services.

127.     Plaintiff is without adequate remedy at law and is suffering irreparable harm, including bodily injury consisting of emotional distress, mental anguish, suffering, and humiliation.  Considering the balance of hardships between the Plaintiff and the Defendant, a remedy in equity is warranted.  The public interest would be served by the issuance of a preliminary and permanent injunction to, *inter alia*, to enjoin and eliminate Defendant's discriminatory practices and the Shoreline Site barriers that deny equal access for disabled persons.

128.     Plaintiff therefore seeks injunctive relief, as well as an award of attorneys' fees, costs, and disbursements pursuant to the ADA, 42 U.S.C. § 12188(a)(1), and/or common law.

**COUNT II**
**Violations of California's Unruh Civil Rights Act ("Unruh Act"),**
**Cal. Civ. Code §§ 51, *et seq*.**
**(On Behalf Of The California Subclass)**

129.     Plaintiff re-alleges and incorporates by reference every allegation set forth in the preceding paragraphs as though alleged in this Count.

130.     Plaintiff brings this claim individually and on behalf of the members of the proposed California Subclass against Defendant.

131.     Defendant is the lessor and operator of Shoreline Amphitheatre, which is a business

establishment within the meaning of the Unruh Act.

132.     The Unruh Act provides that "[a]ll persons within the jurisdiction of this state are free and equal, and no matter what their … disability[ or] medical condition … are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever."  Cal. Civ. Code § 51(b).

133.     The Unruh Act further provides that "[a] violation of the right of any individual under the federal Americans with Disabilities Act of 1990 (Public Law 101-336) shall also constitute a violation of this section."  Cal. Civ. Code § 51(f).

134.     Defendant violated the Unruh Act by discriminating against Plaintiff through violations of the ADA, as described in detail above.  These violations are ongoing.

135.     Defendant has also failed to implement policies, procedures, and practices regarding necessary to ensure compliance with the Unruh Act.

136.     Plaintiff is entitled to injunctive relief; attorney's fees, costs, and disbursements; and compensatory damages for the injuries and losses she sustained as a result of Defendant's discriminatory conduct pursuant to Cal. Civ. Code §§ 52(a), (b), (b)(3).

137.     Plaintiff is further entitled to seek and recover statutory, punitive, and/or exemplary damages to rectify and deter Defendant's discriminatory conduct and the architectural barriers of the Shoreline Site as hereinbefore alleged, pursuant to Cal. Civ. Code §§ 52(a), (b)(1), (h).

**COUNT III**
**Violations of the California Disabled Persons Act ("CDPA"),**
**Cal. Civ. Code §§ 54, *et seq*.**
**(On Behalf Of The California Subclass)**

138.     Plaintiff re-alleges and incorporates by reference every allegation set forth in the preceding paragraphs as though alleged in this Count.

139.     Plaintiff brings this claim individually and on behalf of the members of the proposed California Subclass against Defendant.

140.     The CDPA, Cal. Civ. Code §§ 54-54.3, guarantees full and equal access for people with disabilities to all accommodations, advantages, facilities, and privileges of "all places of public accommodation" and "other places to which the general public is invited."  Defendant's

Shoreline Amphitheatre located in California constitutes a "place[] of public accommodation" or "other place[] where the public is invited" within the meaning of the CDPA.

141.    Defendant's parking facilities on the Shoreline Site constitute goods, services, facilities, advantages, privileges, and/or accommodations provided by Defendant to members of the public in California and are, therefore, subject to the access requirements of Cal. Civ. Code § 54.1, which is applicable to all "places of public accommodation" and "other places to which the general public is invited." *Id*. § 54.1(a)(1).

142.    Defendant is violating the right of disabled persons to full and equal access to public places by denying full and equal access to the parking facilities on the Shoreline Site, in violation of Cal. Civ. Code §§ 54-54.3.

143.    Defendant is also violating the CDPA, in that their actions are a violation of the ADA.  Any violation of the ADA is also a violation of Cal. Civ. Code § 54.1.  *Id*. §§ 52(c), 54.1(d).

144.    As a result of Defendant's wrongful conduct, the individually named Plaintiff and members of the California Subclass are entitled to statutory minimum damages under Cal. Civ. Code § 54.3 for each offense.  *See id*. § 54.3(a).

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks judgment against Defendant, as follows:

a.    For an order certifying the Nationwide Class and the California Subclass under Rule 23 of the Federal Rules of Civil Procedure, naming Plaintiff as representative of the Class and Subclass, and naming Plaintiff's attorneys as Class Counsel to represent the proposed Class and Subclass;

b.    For an order declaring Defendant's conduct violates the statutes referenced herein;

c.    For an order finding in favor of Plaintiff and the Class and Subclass on all counts asserted herein;

d.    For actual, compensatory, statutory, and/or punitive damages in amounts to be determined by the Court and/or jury;

e.    For prejudgment interest on all amounts awarded;

f.    For an order of restitution and all other forms of equitable monetary relief;

g.    For injunctive relief as pleaded or as the Court may deem proper; and

h.     For an order awarding Plaintiff and members of the Class and Subclass their reasonable attorneys' fees, expenses, and costs of suit.

## **JURY DEMAND**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury on all causes of action and issues so triable.


Dated: September 12, 2024                           Respectfully submitted,

**BURSOR & FISHER, P.A.**

By:   */s/ Julia K. Venditti*
       Julia K. Venditti

Neal J. Deckant (State Bar No. 322946)
Julia K. Venditti (State Bar No. 332688)
1990 North California Boulevard, 9th Floor
Walnut Creek, CA  94596
Telephone:  (925) 300-4455
Facsimile:  (925) 407-2700
Email: ndeckant@bursor.com
       jvenditti@bursor.com

*Attorneys for Plaintiff and the Putative Class*